TORBERT, Chief Justice.
This is an appeal from a decision of the trial court allowing Vera W. Adams, an incompetent widow, to dissent, by her only child, Adelia Adams Coker, as guardian, from the will of her deceased husband. For the reasons set out below, we reverse.
On August 26, 1978, W. C. Adams died, leaving one child, Adelia Adams Coker, and an incompetent widow, Vera W. Adams. His last will and testament named Adelia and First Alabama Bank as co-executors and named the bank as trustee of the two trusts created by the will. The will consisted of two trusts, providing Vera with a right to one-half of the estate’s income for life and making the remainder of the income and corpus available to her at the discretion of the trustee, First Alabama Bank. At the death of Vera, the daughter, Adelia, is to become the income beneficiary of one trust, while the remainder of the estate is to be distributed by a general testamentary power of appointment according to Vera’s last will and testament.
Following the death of W. C. Adams, Adelia filed a petition with the probate court seeking letters of administration upon the estate, alleging that the will was void as violating the Rule Against Perpetuities. A number of bearer bonds were also sought by Adelia on behalf of her mother. The trial court held for Adelia and Vera, but this Court reversed, First Alabama Bank of Montgomery v. Adams, 382 So.2d 1104 (Ala.1980), holding that the trusts were valid and that the bearer bonds properly belonged to the estate of W. C. Adams.
Subsequently, Vera was declared incompetent and Adelia was appointed as her guardian. At this point, Adelia, as guardian, filed a dissent from the will. The trial court, after hearing the ore tenus testimony of two of Vera’s sisters-in-law, Adelia, and a representative of First Alabama Bank, held that it was in the best interest of the widow to dissent from the will. First Alabama Bank, as executor and trustee, appeals.
*512 The procedure for the filing of a dissent for an insane widow is set forth in Code 1975:
If the widow is insane, or if she be under the age of 18 years at the time the will is admitted to probate, or if she dies after the death of her husband and before the time for her dissent expires, upon a petition filed by her guardian or next friend, or, if dead, by her personal representative, within the time prescribed in section 43-1-16, alleging that it would be to her interest, or, in case of her death, to the interest of her estate to dissent from the will of her husband, the probate court of the county in which the will is probated has authority to declare dissent from such will for her; and upon the filing of such petition, the court must appoint a day for the hearing, not more than 20 days from the filing thereof, and if the widow is insane, or was under the age of 18 years at the time the will was admitted to probate, a guardian ad litem must be appointed for her. If upon the hearing the court is satisfied from the testimony of at least two disinterested witnesses, taken by deposition upon written questions, that it is to the interest of such widow, or, in case of her death, of her estate, to dissent from the will, an order shall be made declaring such dissent. The costs of the proceeding must be paid by the person filing the application.
Code 1975, § 43-1-17.
This section does not give the guardian of the insane widow the right to make an election to dissent. The guardian is merely given the right to petition the probate court for an order allowing such a dissent. The probate court will allow the dissent only if it is satisfied from the testimony of two or more disinterested witnesses that it is in the widow’s best interest to dissent from the will. Copeland v. Turner, 273 Ala. 609, 143 So.2d 625 (1962).
In Copeland, this Court set out the factors that should be examined by the trial court to determine what is in the “best interest” of the insane widow. The Court stated:
[I]n determining whether or not it is to the interest or “best interest” of an insane widow to dissent from a will, no hard and fast rule should be laid down. Whether or not her interest will be best subserved by a dissent must be determined from all the facts and circumstances in a particular case. It seems to us that a test which is valuable in one case might lead to a ridiculous result in another case.
So, then we must inquire as to the situation in which [the insane widow] is placed by reason of the provisions of her husband’s will and whether it is to her advantage to take under it or to dissent and take under the statute.
273 Ala. at 612-13, 143 So.2d 625. This is the legal standard the trial court should have followed here.
It is the policy of this Court to presume correct the findings of the trial court based upon competent evidence, when the evidence is presented ore tenus. Such findings will not be disturbed on appeal if supported by the evidence or any reasonable inference therefrom, unless they are plainly and palpably erroneous and manifestly unjust. Knapp v. Knapp, 392 So.2d 527 (Ala.1981); Mayo v. Andress, 373 So.2d 620 (Ala.1979); League v. McDonald, 355 So.2d 695 (Ala.1978); Kjelstrom v. First National Bank of Montgomery, 335 So.2d 647 (Ala.1976).[1] The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment. In such instances where the proof at trial fails to support the material *513 allegations on which the suit is based, the judgment rendered cannot be upheld on appeal. Cougar Mining Co. v. Mineral Land & Mining Consultants, Inc., 392 So.2d 1177 (Ala.1981); Mid-State Homes, Inc. v. Cone, 294 Ala. 310, 316 So.2d 333 (1975).
We hold that the evidence was not sufficient as a matter of law to sustain the trial court’s finding that it was in the best interest of the widow for the court to authorize a dissent. The two “disinterested witnesses” who testified that it was in Vera’s best interest to dissent were both Vera’s sisters-in-law who knew little of the facts and consequences of the will. Emma Jean Adams Warren testified that she knew Vera for forty-five to fifty years. When questioned about the estate, she testified as follows:
Q. Are you in general terms familiar with the business affairs of the estate of your late brother, W. C. Adams?
A. No. I don’t know too much about it. Because as long as he lived he handled his own affairs. But I’m under the impression that when the will was made by my brother did not read it—
MR. DILLON: Just a minute, please, Your Honor. We would object to her—
THE COURT: Sustain your objection.
Q. Have you seen the list of the assets in his estate?
A. No, I surely haven’t.
Q. Are you familiar with the business affairs of Vera?
A. Well, am under the impression that her daughter has been able to meet her needs since she’s been in the rest home.
Q. Do you know whether she has any property or not, any assets of her own?
A. I imagine that Crayton left ever-thing [sic] to her as long as she lives.
Q. Do you know whether she owns anything other than what she may have gotten from him?
A. I do not know.
Q. Do you have an opinion as to whether or not it would be in her interest, Vera W. Adams’ interest, to dissent from the will of your brother, W. C. Adams and take what the law would give her as opposed to taking it under that will? That’s yes or no. Do you have an opinion as to that?
A. I don’t see why she didn’t get it all. I’m sure that would have been my brother’s way of doing things.
Q. Well, if she was not left all of the property under his will and if she would take a part of his property by dissent from the will, then I’ll ask you on that hypothesis do you have an opinion as to whether it would be in her interest to dissent from the will?
MR. DILLON: We object to that, Your Honor, based on supposition not in evidence.
MR. BELL: I believe it’s based entirely on the evidence, Your Honor.
THE COURT: I’m going to overrule at this time because we’re not operating with a jury. I think I can separate things.
Q. Would you answer?
THE COURT: You may answer.
A. What?
MR. BELL: Would you read that question back?
(LAST QUESTION READ BACK.)
A. Yes.
Q. Would you tell the Court what that opinion is?
A. Well, I can’t understand why it was left like it was. I don’t see why she couldn’t get it all. It’s to her advantage to have had it. And my brother would turn over in his grave if he could.
Q. Well, I’ll ask you if you think it is in her best interest or to her advantage to dissent from the will and take the part of the property that the law would then give to her as if there had been no will?
MR. RADNEY: She said yes to that.
MR. BELL: I wasn’t sure if there was a direct answer.
A. Yes.
*514 Q. Could you explain to the Court your reasons for that answer of that opinion?
A. I guess part of it is better than nothing. I don’t know.

Q. Is she capable of handling her business affairs at the present time?
A. Well, dt belongs to her.
Q. Is she capable?
A. That’s her affairs. It is not mine.
Q. Is she in your judgment capable of handling her business affairs?
A. Well, I’m not capable. So I wouldn’t comment on her.
Q. From her mental standpoint?
A. Well, you would have to see her and discuss it with her.
Q. Give you your judgment?
A. I don’t have any judgment.

Q. Have you got any estimate as to the total amount of money that may be required to care for her the rest of her life?
A. I don’t know.
Vera’s other sister-in-law, Robbie Mae Warren, likewise testified that she had known Vera for some seventy years, but knew very little about the estate. Relevant portions of her testimony were as follows:
Q. How familiar are you with the financial affairs of the estate of W. C. Adams and the financial affairs of Vera W. Adams?
A. Well, I don’t know any more about it than I have learned in the court since we have been coming.
Q. Well, if Vera Adams were left some income for life under the will of W. C. Adams, but under the law would take a portion of the estate if she dissented from the will, on that hypothesis do you have an opinion as to whether it would be in her interest to dissent from the will of W. C. Adams and to take a portion of the estate for herself?
A. I think it would be in her interest.
Q. Could you explain your reasons for that answer to the Court?
A. Well, speaking from myself and I feel like that you should have — do what you want with your estate or whatever is left to you.
Q. When you say “you”, do you mean everybody and anybody?
A. Everybody and anybody.
MR. BELL: No • further questions. Answer Mr. Dillon’s questions, please, Mam.

Q. Would you describe her present condition and health, physical and mental, to the Court, please?
A. Well, now, Vera knows me when I go out there. It takes her some time to place you. But she does know you. And then after you have visited with her and talked to her if you went back in there and asked her a question had you been in there and then she maybe wouldn’t remember it.
It is clear that the testimony of these two witnesses simply does not show that it is in the best interest of Vera to dissent from the will. The bare statements that it would be in Vera’s best interest to dissent are not sufficient as a matter of law to warrant the dissent, particularly in view of the witnesses’ explanations of their recommendations. All this testimony shows is that the two ladies knew nothing about the provisions of the will and how it would operate to provide income to Vera. Emma Jean Adams Warren stated in essence that she knew nothing of the financial affairs of the parties and that Vera should dissent because “I guess part of it is better than nothing. I don’t know.” Similarly, Robbie Mae Warren stated that her only familiarity with the financial affairs of the estate of W. C. Adams was what she had heard in court, but that she believed the dissent to be proper because “you should have — do what you want with your estate or whatever is left to you.” Without doubt, these statements are insufficient to show that it is in Vera’s best interest to dissent from the will.
Appellee contends that if the dissent is allowed, Vera would be entitled to one-third *515 of the rents under current leases, to stocks and bonds with a book value of about $150,-000, and would be able to produce a higher yield from them than would the bank. In support of this, appellee cites the testimony of Allen Rushing, vice president and trust officer of First Alabama Bank, who stated that six-month money market certificates were presently yielding fourteen to fifteen percent, with certain investments (in excess of $100,000.00) yielding eighteen percent. Other testimony, however, shows that this higher rate of return would not be possible, given the composition of the estate. Allen Rushing also testified that the gross estate of W. C. Adams, based upon the estate tax return, had a face value of $467,399.29. Because of the composition of the estate, Rushing estimated that the annual income from the estate would be $24,047. With the dissent, Vera would be entitled to personalty with a book value of approximately $154,700, plus one-third of the rent under the current leases. This would generate around $12,200 per year. Rushing also stated that at the current rate of return, and at the current withdrawal rate of $2,000 per month, Vera’s share in the estate, were the dissent allowed, would be completely exhausted in seven to eight years. Additionally, to allow the dissent would subject the estate to $13,600 more in estate taxes.
As stated, W. C. Adams’s estate is valued at approximately $467,000. Included in that estate are seven parcels of real property valued at over $150,000, with several of the lots subject to long-term leases. The income from these properties can not be increased until the terms of the leases have expired, or until the land is sold. Because of the long-term leases, sale of the properties would drive their values downward. Another $150,000 is tied up in bonds, which are mostly long-term, low-yield, tax-free debentures that can be converted into cash only at substantial discounts. The majority of the estate’s remainder consists of various blocks of stocks. Thus, it is quite apparent that the rate of return on the estate can not reach the high percentages of certificates of deposits from which the appellee has based her comparisons.
For the reason that the evidence presented to the trial court was insufficient as a matter of law to sustain its judgment, the presumption generally accorded its finding has been rebutted. This being the case, the decision of the trial court is due to be reversed and the case remanded for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
MADDOX, JONES, SHORES and BEAT-TY, JJ., concur.

. For two recent cases involving the interplay between the sufficiency of the evidence ground and the weight and preponderance of the evidence, see, Casey v. Jones, 410 So.2d 5 (Ala.1981), and Garmon v. King Coal Company, Inc., 409 So.2d 776 (Ala.1981). As these two cases point out, the “palpably wrong, manifestly unjust” standard by which the latter is tested is not invoked where the evidence is sufficient to support the judgment.