SHAW, Justice.
Mitzi Lawson, a defendant below, appeals from a $500,000 judgment in favor of Harris Culinary Enterprises, LLC (“HCE”), John C. Harris III (“Clinton”), and John C. Harris, Jr. (“John”), the plaintiffs below (hereinafter sometimes referred to collectively as “the Harrises”), on their fraud claims related to their purchase of a restaurant franchise. We reverse and render a judgment in favor of Mitzi.

Facts and Procedural History

At all times pertinent to the events giving rise to the underlying action, Mitzi was married to her codefendant, Sims Lawson. Following his marriage to Mitzi, Sims, an accountant, formed SYM, Inc. (“SYM”), also a codefendant in the underlying action, for the purpose of operating a “Fox’s Pizza Den” restaurant franchise in Killen (“the Killen franchise”). Sims is president of SYM. Sims purchased a building in which to operate the Killen franchise; that building was titled solely in Mitzi’s name.
At some time before the events giving rise to their present claims, John and Clinton formed HCE, an Alabama limited liability company, for the purpose of operating pizza-restaurant franchises. Although both John and Clinton are members of HCE, Clinton was designated as the “managing member.”
In March 2007, the Harrises entered into negotiations with Sims to purchase the Killen franchise. According to the Harrises, in an apparent attempt to secure a higher purchase price, Sims purportedly *486 generated false financial reports evidencing higher gross sales and profits for the Killen franchise than were actually realized. Upon review of the purported falsified reports, the Harrises increased their initial offer and, in May 2007, ultimately purchased the Killen franchise. As a condition of the sales agreement, the Harrises entered into a one-year lease agreement to continue operation of the Killen franchise in its then current location.
In August 2007, the Harrises initiated the underlying action, alleging that, as a result of Sims’s presentation to them of falsified reports, they had been induced to purchase the Killen franchise and to enter into the lease agreement, suffering damage as a result. Their complaint, which charged SYM, Sims, and Mitzi under several theories of fraud, specifically indicated that Mitzi was being sued “as owner and lessor of the [building]” in which the Killen franchise was located. In response to the Harrises’ complaint, Mitzi moved both to dismiss any claims asserted against her in that pleading and, subsequently, for a summary judgment in her favor on the ground that the complaint did not allege— and that there was no evidence to support — a claim that Mitzi had made any representation, false or otherwise, to the Harrises. The trial court denied both motions.
The matter proceeded to a bench trial on July 13, 2010, at which neither Sims nor SYM (nor a representative for either) appeared to defend against the Harrises’ claims.[1] During that proceeding, the trial court heard ore tenus evidence from Clinton and John, from Mitzi, and from David Holcombe, a former employee of SYM, who had worked at the Killen franchise.
Clinton testified that, as a result of his past experience in the “pizza business,” the Harrises began looking at pizza-restaurant franchise opportunities. After learning about and investigating opportunities available with Fox’s Pizza Den, the Harris-es ultimately purchased a Fox’s Pizza Den franchise and opened an initial location in Petersville (“the Petersville franchise”). Because of the profitability of that initial location, the Harrises began seeking another Fox’s Pizza Den franchise, which they ultimately purchased and opened in Muscle Shoals (“the Muscle Shoals franchise”).
At the time the Harrises were expanding their operations, according to Clinton, John encountered Sims at a funeral they were both attending, and the Harrises were apprised of the possibility of purchasing the Killen franchise from Sims. Clinton subsequently went to inspect the Killen franchise. According to Clinton, he received a tour of the building in which the Killen franchise was located and an explanation of its business practices. Clinton indicated that Mitzi was present during these activities but that “[s]he was quiet.” Clinton indicated that, at the conclusion of his tour, he requested the “sales numbers” associated with the Killen franchise. After receiving records evidencing the sales receipts for the Killen franchise through December 2006, which evidenced monthly average sales of $20,000, Clinton indicated to Sims that he was no longer interested in purchasing the Killen franchise because the sales figures “were too low....”
Clinton stated that once he relayed his disinterest based on the disappointing sales numbers, Sims contacted John and further negotiation ensued, which culmi *487 nated in an initial offer by the Harrises to purchase the Killen franchise. SYM, however, rejected that initial offer, and additional negotiation occurred, which ultimately resulted in an agreement for the Harrises to purchase the Killen franchise.
Clinton testified that, during the course of the negotiations immediately preceding the purchase agreement reached by the parties, Sims represented to the Harrises that the sales numbers for the Killen franchise were increasing and that they were better than the initial sales numbers that had been provided to the Harrises. Specifically, according to Clinton, Sims
“[told them] that since bridge construction [on the adjacent Shoals Creek Bridge] had ended in December of 2006, ... [the Killen franchise’s] average sales had increased from the twenty thousand average we were shown going through December 2006 to — steadily to an average of thirty thousand in March of 2007.”
Clinton further stated that the Harrises were initially provided “a printout” evidencing the allegedly increasing sales numbers for January 2007, February 2007, and March 2007. Clinton testified that documentation was provided “by [Sims]” and was presented “[o]n behalf of the corporation.” [2] Clinton was unable to identify any documentation that had been provided to the Harrises by Mitzi. He further acknowledged that, during the negotiation period, Mitzi never made a single statement to the Harrises nor answered any question that they might have asked.
Clinton indicated that, upon the Harris-es’ request for further supporting documentation, Sims also provided sales-tax records for January 2007, February 2007, and March 2007. According to Clinton, the information provided by Sims verified Sims’s claims that sales for the Killen franchise had steadily increased from December 2006 through March 2007. Clinton indicated that, based on that information, the Harrises entered into final negotiations for the purchase of the Killen franchise. Clinton noted that only Sims was involved in the negotiations associated with the sale of the Killen franchise and with regard to the lease of the building where the franchise was located.[3] He further acknowledged that only Sims, in his capacity as president of SYM, signed the sales contract transferring the Killen franchise to the Harrises.
However, Clinton indicated that, with regard to the lease, Sims asserted that he was handling the negotiations on behalf of Mitzi, who, Sims indicated to the Harrises, was actually the sole owner of the building. As with the sales negotiations, Clinton confirmed that Mitzi apparently signed the lease agreement outside his presence, and he never had a single discussion with her regarding the lease terms Sims had negotiated. Nonetheless, Clinton stated that he was instructed to make the lease payments directly to Mitzi. Clinton further testified that, with regard to the lease transactions, no misrepresentations were made to the Harrises.
Following the sale, the Harrises took possession of the Killen franchise and Mit *488 zi’s building on May 14, 2007. Clinton indicated that, following the transfer, the Killen franchise averaged $4,000 to $5,000 per week, which numbers, he said, “were not in keeping with [Sims’s] representations.” In fact, Clinton noted, the numbers were more in line with the initial sales numbers provided to the Harrises (those evidencing the sales numbers for the Kil-len franchise in late 2006), which Clinton had deemed to be too low to justify the purchase of the Killen franchise. Specifically, according to Clinton, $20,000 was too low a monthly sales figure for a pizza franchise to operate profitably.
Clinton stated that, in accordance with the purchase of the franchise, he had been provided “the card necessary to access ... the computers at the Killen [franchise].”[4] Although the only access card provided the Harrises was issued in Mitzi’s name, Clinton testified that Sims actually gave him the computer-access card. Clinton then had an employee use the accounting software still loaded on one of the computers at the Killen franchise to produce a report of the sales numbers beginning in January 2007. According to Clinton, the report generated by that search confirmed “[t]hat the store sales average never went over [$20,000] a month.”[5]
Clinton acknowledged that the Harrises had no evidence indicating that Mitzi “had anything to do with [the] documents Sims gave [the Harrises].” As to evidence indicating Mitzi’s involvement in the Killen franchise, Clinton pointed to the fact that Mitzi had been responsible for handling payroll at the Killen franchise and that, as evidenced by the computer-access card issued in her name, Mitzi had access to the computer system used at the Killen franchise.[6] Once the Harrises became aware of the discrepancy in the reported earnings versus the actual earnings, as noted above, they filed the underlying action.
John’s testimony was substantially similar to Clinton’s testimony. John confirmed that he incorporated HCE for the purpose of operating a pizza franchise in Petersville and that, as a result of the success of that initial enterprise, the Har-rises began looking to expand that business. He further confirmed that he was approached by Sims, with whom he was previously acquainted, at a funeral, during which Sims indicated that he was looking to retire and to sell his pizza business. John testified that he relayed that information to Clinton, who then visited the Killen franchise.
John also confirmed that he personally guaranteed the start-up loans associated with each of the three Fox’s Pizza Den franchises the Harrises operated and that he expended moneys from his personal savings to cover monthly expenses for each franchise and was ultimately forced to take out a loan secured by the building that housed his law practice. Documentation admitted during John’s testimony indicated that he had personally incurred obligations and/or expended moneys in associ *489 ation with the operation of the franchises totaling $385,546. He further indicated that attempting to use moneys generated by the profitable Petersville franchise to keep the Muscle Shoals and Killen franchises afloat and, later, to pay the outstanding obligations associated with those two failing franchises during an economic downturn ultimately doomed the entire enterprise. As a result, John indicated that the Harrises also closed the Petersville franchise in December 2009. John offered no testimony regarding Mitzi’s role in either the Killen franchise or the negotiations leading to the Harrises’ purchase of that franchise.
In her trial testimony, Mitzi confirmed that she was working at the Killen franchise on the date of Clinton’s initial visit. Specifically, she recalled seeing Clinton standing at the counter. Mitzi also recalled, however, that her only contact with Clinton during his visit was “when [she] was up front using the phone to make sure they was [sic] getting a delivery correctly [sic] and [she] saw him, and Sims introduced [them].” Although she testified that Sims occasionally asked her for her input when making business-related decisions, Mitzi denied any “extensive” involvement in the operation of the Killen franchise. In fact, Mitzi specifically denied ever serving as the manager of the Killen franchise and could not recall ever having even signed a check related to its operation. According to Mitzi, the only bank deposits she was ever responsible for making were when she was assisting with pizza delivery.
Although Mitzi acknowledged that she might occasionally have accepted customer payments while standing at or near the counter, she said that she never totaled the day’s receipts for deposit and could not recall ever having been responsible for making any “final deposit at night.” She did, however, acknowledge that she was responsible for payroll during the three years SYM operated the Killen franchise, a job she says she performed from a computer at her residence. In fact, Mitzi stated that the only time she ever logged onto a computer at the Killen franchise would have been in relation to a scheduling issue. She further indicated that she was unable to recall ever logging into a password-protected program on a computer at the Killen franchise. According to Mitzi, the only time she ever used the computer-access card, which Sims later gave to Clinton, was when it was initially issued during tests to confirm that the card was working properly and to enter the delivery addresses of repeat customers. She specifically denied ever having seen any type of spreadsheet on the computer during that limited use or ever having “worked with numbers” in the computer at the Killen franchise. Mitzi also denied ever looking at or assisting with the assembly of monthly sales figures for the Killen franchise.
More specifically, Mitzi denied ever seeing the allegedly fraudulent sales records Sims provided to the Harrises. According to her testimony, the only information she received from Sims was an indication that “the business was doing well.” Mitzi also denied that Sims discussed with her any of his negotiations with the Harrises, including his statement to the Harrises that business had improved since the conclusion of nearby road-construction work. According to Mitzi, she and Sims “didn’t discuss the pizza place very much at all.”
Mitzi did admit, however, that Sims informed her during the course of the negotiations with the Harrises that the Harris-es were going to rent the building and that she “said that’s fine.” She further indicated that, although Sims never approached her to obtain her approval before arriving at a rental figure for the building, the *490 rental amount he quoted the Harrises was acceptable to her.
Holcombe indicated that he worked as a shift leader at the Killen franchise for approximately five months in or around 2005 or 2006. According to Holcombe’s testimony, he was promoted to assistant manager, at which time Sims asked him to take responsibility for the final night deposits, which Holcombe said, included tallying all receipts to arrive at total intake (adding checks and cash and subtracting credit-card purchases), then subtracting the $200 operating cash for the next day and depositing the remainder. Holcombe indicated that, at the time he was assigned that duty, Sims specifically informed him “that those deposits had been done in the past in part by Mitzi.” However, he specifically noted that, once he assumed that responsibility, “[he] was the only one that did them.”
According to Holcombe, during the time he was responsible for the nightly deposits, the intake of the Killen franchise ranged from around $200 on a slow night to $2,000 on a busy night. Also according to Holcombe, the computer in the office of the Killen franchise “had all the actual information” associated with the business, including a spreadsheet showing the daily receipts for the Killen franchise as reflected by the nightly deposits. Holcombe described Mitzi’s role with regard to the Killen franchise as follows: “It was her job basically [to] keep up relations with [the bigger] customers.” He further noted that when large orders came in associated with church or school events Mitzi was responsible for making the delivery and returning the associated payment to the Kil-len franchise.
At the close of the Harrises’ evidence, Mitzi moved for a “directed verdict” [7] on grounds that the Harrises’ claims against her alleged misrepresentations of material fact and that the Harrises had failed to present any evidence of a single misrepresentation or any failure to disclose on Mitzi’s part.[8] The trial court denied Mitzi’s motion. Immediately thereafter, Mitzi both rested and renewed her motion for a judgment as a matter of law, again arguing that there was no evidence of any “wrongdoing [by Mitzi] as a lessor of the building.” The Harrises responded by acknowledging that although “the evidence ... doesn’t have [Mitzi] directly saying anything to either of the Harrises with regard to representations about business earnings and that sort of thing[, the evidence] proves that she’s all in and around th[e operation of the Killen franchise].”
Following the conclusion of the trial, the trial court entered on July 14, 2010, a judgment “in favor of the plaintiffs and against the defendants” in the amount of $500,000, which amount represented a compensatory-damages award of $380,000 and a punitive-damages award of $120,000. The trial court’s order, however, failed to include the factual findings on which those awards were based. Mitzi timely filed, pursuant to Rule 59(e), Ala. R. Civ. P., a postjudgment motion seeking to amend the trial court’s judgment on the grounds that the trial court misapplied the law to *491 the facts established by the evidence at trial; that the Harrises presented insufficient evidence to defeat Mitzi’s motion for a judgment on partial findings; that the compensatory-damages award had been incorrectly calculated and was not supported by the evidence; and that punitive damages were not warranted and/or that the punitive-damages award was excessive.[9] The trial court denied Mitzi’s motion by an order entered August 16, 2010. Mitzi appeals.[10]

Standard of Review

As noted above, Mitzi appeals from the trial court’s denial of her motion filed at the close of all the evidence, properly termed a motion for a judgment on partial findings by the trial court. See supra note 7. “The standard of review applicable ... to rulings on motions for a judgment on partial findings by the trial court” is “[o]rdinarily ... the ore tenus standard.” Burkes Mech., Inc. v. Ft. James-Pennington, Inc., 908 So.2d 905, 910 (Ala.2004) (citing Loggins v. Robinson, 738 So.2d 1268, 1270 (Ala.Civ.App.1999), and Grant v. Bullock County Bd. of Educ., 895 F.Supp. 1506, 1508-09 (M.D.Ala.1995) (review under Rule 52, Fed.R.Civ.P.)). Under the ore tenus standard of review, findings on disputed facts are presumed correct, and the trial court’s judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust. Southside Cmty. Dev. Corp. v. White, 10 So.3d 990, 991 (Ala.2008). “““The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.’ ” ’ ” 10 So.3d at 991-92 (quoting Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So.2d 924, 929 (Ala.2007), quoting in turn Waltman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005), quoting in turn Dennis v. Dobbs, 474 So.2d 77, 79 (Ala.1985)). See also First Alabama Bank of Montgomery, N.A. v. Coker, 408 So.2d 510, 512-13 (Ala.1982) (“The presumption of correctness [attendant to ore tenus findings] is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment. In such instances where the proof at trial fails to support the material allegations on which the suit is based, the judgment rendered cannot be upheld on appeal.”). Additionally, we note that “the ore tenus standard is inapplicable “where the evidence is undisputed, or where the material facts are established by the undisputed evidence.’ Salter v. Hamiter, 887 So.2d 230, 234 (Ala.2004).” Burkes Mechanical, 908 So.2d at 910. In such cases, appellate review is de novo. Id. See also Ragsdale v. Ragsdale, 991 So.2d 770, 772 (Ala.Civ.App.2008).

Discussion

On appeal, Mitzi initially argues that the Harrises presented insufficient evidence to support a conclusion that she made any misrepresentation to the Harrises or that she suppressed any fact that she was duty-bound to disclose.[11] (Issues I and II, re *492 spectively, in Mitzi’s brief to this Court).[12] More specifically, she contends that the ore tenus evidence demonstrated neither any act nor any failure to act on her part amounting to actionable fraud and that the trial court’s apparent conclusion to the contrary was erroneous. Mitzi argues that any fraudulent acts in this case were committed by Sims alone.
The Harrises counter Mitzi’s contention that she personally made no misrepresentation by citing the following evidence:
“Mitzi owned the building in Killen where the [Killen franchise] was located. She leased the building to the Harrises under an agreement negotiated in her behalf by her husband, Sims Lawson. She received lease payments and acted as a community relations liaison for the store. She had input into how the business was run and did the store payroll for three years. She prepared reports and night deposits which required the use of the store computer containing all the store’s financial information. She had the card which gave her access to the computer with her name on it and no one else’s. She even admitted (although grudgingly) that she used the card to log into the computer. Mitzi was also present when Sims Lawson showed Clinton Harris around the store during negotiations for its sale.”
The Harrises’ brief, at pp. 15-16 (citations to record omitted).
“To establish a cause of action for fraudulent misrepresentation, the plaintiff must show 1) that the defendant made a misrepresentation; 2) that that misrepresentation concerned a material existing fact; 8) that the plaintiff relied on the misrepresentation; and 4) that the reliance was to the plaintiffs detriment. Ala.Code 1975, § 6-5-101; Crowder v. Memory Hill Gardens, Inc., 516 So.2d 602 (Ala.1987). Under [Ala.Code 1975,] § 6-5-101, ‘legal fraud’ includes misrepresentations of material fact made ‘by mistake or innocently,’ as well as misrepresentations made ‘willfully to deceive, or recklessly without knowledge.’ Young v. Serra Volkswagen, Inc., 579 So.2d 1337 (Ala.1991).
“In order to establish a cause of action for fraudulent suppression, the plaintiff must show 1) that the defendant had a duty to disclose material facts, 2) that the defendant concealed or failed to disclose those facts, 3) that the concealment or failure to disclose induced the plaintiff to act; and 4) that the defendant’s action resulted in harm to the plaintiff. Interstate Truck Leasing, Inc. v. Bender, 608 So.2d 716 (Ala.1992). A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of a duty to disclose is not fraudulent. Dodd v. Nelda Stephenson Chevrolet, Inc., 626 So.2d 1288 *493 (Ala.1993); Hardy v. Blue Cross & Blue Shield of Alabama, 585 So.2d 29 (Ala.1991); King v. National Foundation Life Ins. Co., 541 So.2d 502 (Ala.1989); See, McGowan v. Chrysler Corp., 631 So.2d 842 (Ala.1993); Ala.Code 1975, § 6-5-102.”
Jewell v. Seaboard Indus., Inc., 667 So.2d 653, 657-58 (Ala.1995). See also Crowder v. Memory Hill Gardens, Inc., 516 So.2d 602, 604-05 (Ala.1987).
Therefore, to succeed on their fraudulent-misrepresentation claim against Mitzi, the Harrises were required to show a misrepresentation of a material fact by Mitzi. However, as the Harrises acknowledged in response to Mitzi’s renewed motion for a judgment as a matter of law at the close of all the evidence, and as Mitzi argues in her brief to this Court, no representation was made by Mitzi to the Harrises that would support a fraudulent-misrepresentation claim under § 6-5-101, Ala.Code 1975. See Parker v. Thyssen Mining Constr., Inc., 428 So.2d 615, 618 (Ala.1983) (“To constitute fraud, there must be some misrepresentation of material fact to a party who relies upon such misrepresentation to his detriment. Ball v. Vogtner, 362 So.2d 894 (Ala.1978); Ala.Code 1975, §§ 6-5-100 to 6-5-104.” (emphasis added)), and Mann v. Adams Realty Co., 556 F.2d 288, 296 (5th Cir.1977) (applying Alabama law and noting that “[tjhe misrepresentation may be willful or it might be ‘made by mistake and innocently,’ but it must be ‘made’ in any event.” (footnote omitted)).
Based on their inability to make the requisite demonstration under the facts of their case, and as explained in their brief to this Court, the Harrises’ fraud claims against Mitzi were based primarily on their contention that Mitzi’s mere proximity to and occasional presence in the Killen franchise, by virtue of her marriage to Sims, was sufficient “to show that Mitzi participated in and/or suppressed the fraudulent representations made by her husband, Sims.” The Harris-es’ brief, at p. 10. We disagree.
Specifically, even assuming, as Holcom-be testified, that Mitzi had, at some time before 2005 or 2006, occasionally been responsible for night deposits and for payroll, we see nothing associated with either of those responsibilities that would have placed her in a position to be aware of the total sales numbers for the Killen franchise in the first quarter of 2007 (especially given the variance in the nightly deposit amounts as testified to by Holcombe). Initially, we note that it was also undisputed that any payroll responsibilities Mitzi performed were performed using her home computer and not the computer on the premises at the Killen franchise. Moreover, even if, as Holcombe also testified, information regarding the daily sales receipts for the Killen franchise was available on the computer at the Killen franchise, Mitzi’s undisputed testimony indicated that she never looked at or helped assemble those numbers. Additionally, by all accounts, and as evidenced by Clinton’s later retrieval, the figures available on the office computer at the Killen franchise were, in fact, the actual sales numbers for the business. The Harrises fail to explain how, in the absence of any evidence presented by them indicating that Mitzi could be linked to or was even aware of the allegedly falsified numbers generated by Sims or that she was present when the report containing those numbers was provided to the Harrises, access to the actual numbers would have made Mitzi a party to Sims’s fraudulent actions. Moreover, Mitzi indicated that she possessed no personal information indicating that any of the information Sims provided to the Harrises was anything other than accurate and complete when it was provided. Finally, *494 we note that Mitzi testified as to her limited input into and participation in the business, a fact that, we find, was supported by Holcombe’s testimony, as set out above, and that was not disproved by the Harris-es.
Assuming, without deciding, that the Harrises’ fraudulent-suppression claim was tried by the implied consent of the parties, see Rule 15(b), Ala. R. Civ. P., and that their complaint was constructively amended to conform to the evidence, we also conclude that there was insufficient evidence to support a judgment in their favor on a fraudulent-suppression claim against Mitzi. Specifically, in the absence of any evidence demonstrating Mitzi’s knowledge as to the creation of and participation in providing the alleged fraudulent financial report, we conclude, and the Har-rises concede, that not only did Mitzi not make any misrepresentation to the Harris-es, but the evidence adduced at trial failed to demonstrate that she was even aware of any material fact to conceal. See Dodd v. Nelda Stephenson Chevrolet, Inc., 626 So.2d 1288, 1292 (Ala.1993) (“One can be liable for suppression only of a fact of which one has knowledge.” (citing Cornelius v. Austin, 542 So.2d 1220, 1224 (Ala.1989)); and McGarry v. Flournoy, 624 So.2d 1359, 1362 (Ala.1993) (“An action for suppression will lie only if the defendant actually knows the fact alleged to be suppressed.”). See also Boackle v. Bedwell Constr. Co., 770 So.2d 1076, 1080 (Ala.2000); Cherokee Farms, Inc. v. Fireman’s Fund Ins. Co., 526 So.2d 871, 875 (Ala.1988); Harrell v. Dodson, 398 So.2d 272, 276 (Ala.1981); McIver v. Bondy’s Ford, Inc., 963 So.2d 136, 143 (Ala.Civ.App.2007); and LaCoste v. SCI Alabama Funeral Servs., Inc., 689 So.2d 76, 80 (Ala.Civ.App.1996). We will not presume an element of the Harrises’ claim that their evidence admittedly fails to demonstrate. Therefore, as to Mitzi, the Harrises’ fraud claims must fail.
Moreover, to the extent that the Harrises argue that an agency relationship existed between Sims and Mitzi with regard to the lease of Mitzi’s building and that, therefore, Mitzi is liable for Sims’s alleged misrepresentations, even assuming, as they contend, that an actual agency relationship arose with regard to that separate transaction, that argument is also unpersuasive in light of Clinton’s testimony that Sims made no misrepresentation with regard to the lease. Instead, the only misrepresentations identified by the Har-rises were allegedly made by Sims with regard to the business of the Killen franchise. Because Mitzi was neither an officer nor a shareholder in SYM, which solely owned the Killen franchise, Mitzi possessed no interest with regard to that transaction for which Sims might have served as her representative.
In sum, there was no evidence before the trial court from which it could have reasonably determined either that Mitzi made any misrepresentation to the Harris-es or that Mitzi had knowledge of and failed to disclose the fraudulent misrepresentations Sims made to the Harrises. Simply stated, after careful review of the record, we hold that the evidence presented in this case by the Harrises will not support a valid claim of fraudulent misrepresentation or fraudulent suppression against Mitzi. See Coker, supra. Although the Harrises contend that the trial court simply may have found Mitzi not to be credible, even assuming that the trial court considered all of Mitzi’s testimony to be lacking in credibility, the Harrises’ evidence was still insufficient to demonstrate any fraudulent act by Mitzi or to sustain the trial court’s judgment against her. See White, supra. Therefore, we reverse the trial court’s judgment against Mitzi *495 and render a judgment in her favor as to the Harrises’ fraud claims. The judgment against SYM and Sims was not appealed, is not properly before us, and, therefore, remains unaffected by our decision.
Because of our reversal of the trial court’s judgment against Mitzi, we preter-mit discussion of the remaining issues raised on appeal by Mitzi with regard to the propriety of the trial court’s accompanying damages award. See Favorite Market Store v. Waldrop, 924 So.2d 719, 723 (Ala.Civ.App.2005) (stating that this Court would pretermit discussion of further issues in light of the dispositive nature of another issue).
REVERSED AND JUDGMENT RENDERED.
WOODALL, STUART, BOLIN, PARKER, MURDOCK, MAIN, and WISE, JJ., concur.
MALONE, C.J., concurs in the result.

. At the time of the trial, Mitzi was divorced from Sims. Specifically, her testimony indicated that their marriage was terminated in February 2009. Additionally, it appears that Sims was unavailable for trial because, at that time, he was incarcerated on an unrelated federal tax-evasion conviction.

. Specifically, at the time of the admission into evidence of the report showing the purported actual sales numbers for the Killen franchise, counsel for the Harrises stipulated on the record that the alleged fraudulent information "came from Sims.”

. In fact, as Clinton acknowledged during his trial testimony, his previous sworn responses to discovery, in which he was asked to identify all persons with whom he spoke regarding the value of the Killen franchise, purposefully omitted Mitzi's name because he did not speak with her.

. The record reflects that there were three computers at the Killen franchise: two that were used “up front" and were associated with placing customer orders and a separate computer "in the back” that was used to obtain financial information associated with running the business.

. It appears from the record that SYM actually paid sales tax on the allegedly inflated sales numbers Sims had furnished to the Harrises.

.Clinton specifically acknowledged during his testimony that the allegedly falsified reports provided by Sims would have had to have been prepared on a computer other than the one used in the Killen franchise and transferred to the Harrises at the time of the sale of the franchise, because the computer at the Killen franchise retained the lower sales figures.

. “A directed verdict is now referred to as a judgment as a matter of law. See Rule 50, Ala. R. Civ. P.” Skerlick v. Gainey, 42 So.3d 1288, 1289 n. 2 (Ala.Civ.App.2010). However, "[i]n an action tried upon the facts without a jury, such a motion is properly characterized as a motion for a judgment on partial findings by the trial court.” Ex parte Wood, 69 So.3d 166, 169 n. 3 (Ala.2010) (citing Rule 52(c), Ala. R. Civ. P.).

. Mitzi included this last argument despite her contention that the Harrises' complaint failed to allege that she had and breached a duty to disclose.

. Mitzi supported her contention that the punitive-damages award was' excessive with her own affidavit testimony indicating that "[her] net worth is $0 or is negative.”

. Upon application to the trial court, Mitzi was granted leave to proceed in forma pau-peris on appeal. See Rule 24(a), Ala. R.App. P.

.Contrary to the Harrises' assertion in their brief to this Court, Mitzi’s argument pertaining to any potential fraudulent-suppression claim does not concede that the Harrises actually presented such a claim. Mitzi’s brief, at p. 25. Instead, Mitzi makes clear that, although a fraudulent-suppression claim was not included in the Harrises' complaint, based on the arguments of counsel for the Harrises *492 during trial and the absence of any specific findings by the trial court in that regard, to the extent that any such claim may have been tried by the implied consent of the parties, it is also unsupported by the evidence.

. Because in her postjudgment motion Mitzi properly challenged the sufficiency of the evidence to sustain the trial court’s judgment, which did not include findings of fact, she has properly preserved her claims for purposes of appeal. See New Props., L.L.C. v. Stewart, 905 So.2d 797, 801-02 (Ala.2004) ("[H]old[ing] that, in a nonjury case in which the trial court makes no specific findings of fact, a party must move for a new trial or otherwise properly raise before the trial court the question relating to the sufficiency or weight of the evidence in order to preserve that question for appellate review.”).