Gladys Banks sued Memory Chapel Funeral Homes, Inc.,[1] and its employee, Michael O. Stewart, on October 7, 1997, alleging fraudulent suppression, fraudulent misrepresentation, civil conspiracy, and negligence, all arising out of her purchase of funeral services and burial merchandise from Memory Chapel. On September 21, 2000, Memory Chapel and Stewart moved for a summary judgment as to all claims. On October 10, 2000, Gladys filed a brief and other materials in opposition to the defendants' motion for summary judgment; however, Gladys did not contest the motion for summary judgment as it related to her claims alleging fraudulent misrepresentation and civil conspiracy.
On October 12, 2000, the trial court conducted a hearing on the defendants' motion for summary judgment. On October 18, 2000, the court entered a summary judgment in favor of Memory Chapel and Stewart on all claims. Ms. Banks appealed. The supreme court transferred the appeal to this court, pursuant to § 12-2-7, Ala. Code 1975.
In reviewing the disposition of a motion for summary judgment, we use the same standard the trial court used in determining whether the evidence before it presented a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Bussey v. JohnDeere Co., 531 So.2d 860, 862 (Ala. 1988); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of BaldwinCounty, 538 So.2d 794 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989). This court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412
(Ala. 1990).
The evidence, viewed in a light most favorable to Ms. Banks indicates the following: In September 1996 Memory Chapel had a contractual agreement with Liberty National Life Insurance Company whereby Memory Chapel would provide funeral services and burial merchandise to holders of Liberty National burial policies, in exchange for a fee from Liberty National. The "Battle Litigation"[2] requires a funeral home, such as Memory Chapel, to inform a customer/policyholder of the effect and consequence of declining the "policy funeral" and electing instead to purchase a different casket or service, thereby creating what is known as an "oversale." When an "oversale" is created, the burial policy is voided and the funeral home is free to charge as it pleases for the items or services, allowing as a credit only the policy-designated retail value of each item. See Taylor v. Liberty Nat'l Life Ins. Co., 462 So.2d 907
(Ala. 1984), for a detailed *Page 23 
discussion of the effect of an "oversale" on a policyholder. The effect of an "oversale" is not explained in the Liberty National burial policy
Ms. Banks's husband died on September 5, 1996. At that time Ms. Banks was 73 years old and was visually impaired. She testified that she has implants in both eyes, sees nothing out of one eye, and very little out of the other eye. On the day following her husband's death, Ms. Banks went to Memory Chapel in order to make the necessary funeral arrangements. She was accompanied by her son Wade Banks, her daughter Kathy Cunningham, and her daughters-in-law Brenda Banks and Diane Banks.
Ms. Banks and her family met with Stewart, a funeral director at Memory Chapel, and presented him with several Liberty National policies, including two burial policies and three life insurance policies. Stewart took the policies to determine their face value and to give Ms. Banks and her family an estimate as to the cost of the funeral and the amount the policies would pay. Ms. Banks and her family were under the assumption that the policies would pay the entire cost of the funeral.
Stewart showed Ms. Banks and her family a metal casket that was provided for under the terms of the policy. Stewart explained, however, that the casket provided by the policy would not seal and that water, dirt, and bugs would get into the casket. Ms. Banks and her family therefore decided on a casket that was not covered under the terms of the policy — they selected "a better grade of casket." She and her family testified that Stewart did not explain to them the effect of choosing a casket that was not provided for by the policy. It was the family's understanding that they would be required to pay the difference between the casket provided for by the policy and the casket they selected. Ms. Banks and her family testified that had they known they would lose the benefits of the policies by choosing a casket that was not provided for under the policy, they would have chosen a casket provided for under the policy.
After Ms. Banks and her family had selected a casket, Stewart presented her and Wade with what they called a "stack" of documents to sign. Stewart, they said, "controlled" the documents by handing them to Ms. Banks and Wade and directing them where to sign. Wade witnessed his mother's signature on the documents. One document contained in the "stack" of documents signed by Ms. Banks and witnessed by Wade was a document entitled "INFORMATION FOR LIBERTY NATIONAL OR BROWN SERVICEPOLICYHOLDERS." This document states:
 "IF YOU DECIDE TO USE A DIFFERENT CASKET, YOU CANNOT RECEIVE THE POLICY FUNERAL. In that situation, we will charge our usual price for merchandise and services, based on the General Price List and we will give you a credit on the price equal to the face value of the policy.
". . . .
 "Having read this document, I decline the policy funeral available under the Liberty National or Brown-Service policy I have presented to the funeral home. I have watched the funeral home's videotape about policy funerals.[3] I acknowledge that the funeral home has shown me the policy casket, and I understand that, because I have decided to use a different casket, I cannot receive the policy funeral. I understand that, *Page 24 
as a result of my decision, the funeral home will charge its usual price for both merchandise and services, including the services that I could otherwise receive without charge by accepting the policy funeral, and that the funeral home will give me a credit on the price equal to the face value of the policy. I understand I could receive the policy casket and funeral service including floral service, register book and cards and other miscellaneous services for $705.00."
It is undisputed that neither Ms. Banks nor Wade, nor any other family member with them at Memory Chapel that day, read the documents presented to them. No family member read the documents to Ms. Banks. Wade testified that he did not read the documents because, he said, he "really didn't see no need of it." He said, "We pretty well put our trust in this man to give us what we needed." Wade further stated that the family was not instructed not to read the documents and were not rushed to read them.
Stewart testified in his deposition that he and Memory Chapel adhere to the Battle judgment by training Memory Chapel employees to explain the effect of an "oversale" to a policyholder should that policyholder choose a casket or service not provided by the burial policy. Stewart testified that he had no recollection of meeting Ms. Banks and her family. He stated, however, that it is his regular practice to inquire about the existence of any burial policies, and that if the family has a burial policy then he explains to them what the policy provides and explains the effect of choosing a service or casket not provided by the policy.
Ms. Banks was charged $4,035 for the funeral and received a $600 credit for the two burial policies she presented Memory Chapel; therefore, the total cost of the funeral was $3,435. In order to cover the cost of the funeral, Ms. Banks assigned three life insurance policies valued at $1,000 each to Memory Chapel. Her family paid the remaining $345. Had Ms. Banks chosen the "policy funeral," then she would have had to pay only $705.
In order to recover on a claim of fraudulent suppression, a plaintiff must prove: "(1) the suppression of a material fact (2) that the defendant has a duty to communicate (3) because of a confidential relationship between the parties or because of the circumstances of the case and (4) injury resulting as a proximate consequence of the suppression." Ex parte Dial Kennels of Alabama, Inc., 771 So.2d 419, 421
(Ala. 1999). "A `material fact' is a fact that will induce action or inaction by the other party." Id., at 421.
Gladys argues that the trial court erred in holding that the document styled "Information For Liberty National or Brown-Service Policyholders," which was signed by her and witnessed by Wade, satisfied Stewart and Memory Chapel's duty to communicate a material fact, i.e., the effect of an "oversale." In Foremost Insurance Co. v. Parham, 693 So.2d 409
(Ala. 1997), our supreme court overruled Hickox v. Stover, 551 So.2d 259
(Ala. 1989), and replaced the "justifiable-reliance" standard formerly applied in fraud cases with the "reasonable-reliance" standard. The "justifiable-reliance" standard adopted under Hickox "eliminated the general duty on the part of a person to read the documents received in connection with a particular transaction (consumer or commercial)."Parham, 693 So.2d at 421. The return to the "reasonable-reliance" standard once again provided a mechanism
 "whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming *Page 25 
fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms."
Id. at 421. Our supreme court has also stated:
 "`[A] person who signs an instrument without reading it, when he can read, can not, in the absence of fraud, deceit or misrepresentation, avoid the effect of his signature, because [he is] not informed of its contents; and the same rule [applies] to one who can not read, if he neglects to have it read, or to enquire as to its contents.'"
Mitchell Nissan, Inc. v. Foster, 775 So.2d 138, 140 (Ala. 2000), quoting Beck Pauli Lithographing Co. v. Houppert, 104 Ala. 503,506, 16 So. 522, 522 (1894) (emphasis added in Mitchell Nissan).
The undisputed evidence indicates that neither Ms. Banks nor any family member who accompanied her to Memory Chapel read the documents that she signed. This included Wade, who witnessed his mother's signature on the documents. Although Ms. Banks was 73 years old and was visually impaired, a fact understood by her family, no one undertook to read the documents to her or on her behalf before she signed them. No evidence was presented that indicated Ms. Banks or her family had been denied an opportunity to read the documents. Accordingly, we must conclude that the trial court properly entered the summary judgment in favor of Memory Chapel and Stewart on Ms. Banks's claim of fraudulent suppression.
Ms. Banks next argues that the summary judgment was improper as to her claim alleging that Memory Chapel and Stewart had been negligent in failing to inform her of the effect of an "oversale." To prove negligence, a plaintiff must establish (1) that the defendant owed a duty to the plaintiff, (2) that the defendant breached that duty; (3) that the plaintiff was damaged or injured; and (4) that the defendant's breach of duty proximately caused the damage or injury to the plaintiff. FarrMetal, Inc. v. Hines, 738 So.2d 863 (Ala. 1999). The effect of an "oversale" was explained in the document styled "Information For Liberty National Or Brown Service Policyholders." This document was presented to, and was signed by, Ms. Banks and Wade. As has been previously discussed, Ms. Banks and her family did not read the documents presented to them. Accordingly, we must also conclude that the trial court properly entered the summary judgment in favor of Memory Chapel and Stewart on Ms. Banks's negligence claim.
AFFIRMED.
Thompson, Pittman, and Murdock, JJ, concur.
Crawley, J., recuses himself.
[1] Ms. Banks later amended her complaint to substitute as the defendant SCI Alabama Funeral Services, Inc., d/b/a Memory Chapel Funeral Homes, Inc. We will refer to the defendant as "Memory Chapel."
[2] The "Battle Litigation" is a long-standing lawsuit filed in 1970 in the United States District Court for the Northern District of Alabama that developed into a class action involving owners of funeral-home businesses in Alabama and insureds under Liberty National burial policies. See Ex parte LaCoste, 733 So.2d 889 (Ala. 1998).
[3] Banks and her family testified that they were never shown a videotape.