On Application for Rehearing
The opinion of January 16, 2004, is withdrawn, and the following is substituted therefor.
This is a breach-of-contract case.
Diedra H. Wendt's 1999 Ford Taurus automobile was towed to the Friendly Ford automobile dealership for service on January 11, 2001. On January 12, 2001, Wendt entered into a rental agreement with BSI Rentals, Inc., d/b/a National Car Rentals ("BSI"), which was located on the Friendly Ford lot, for the rental of a 2000 Ford Taurus automobile while her automobile was being repaired. On January 19, 2001, Wendt was involved in an accident in which the rented automobile was damaged. On April 1, 2001, BSI sued Wendt, alleging breach of contract and seeking damages in the amount of $16,322.13, plus interest.[1] On April 1, 2001, BSI sued Wendt for breach of contract. On April 30, 2001, Wendt answered and pleaded the affirmative defenses of estoppel, failure of consideration, fraud, and duress. Following an ore tenus proceeding on February 18, 2003, the trial court entered a judgment in favor of Wendt.[2] BSI moved to alter, amend, or vacate the judgment, alleging, in part, that the trial court's judgment was inconsistent with the evidence presented and caselaw; the court denied that motion. BSI appeals.
The record reflects that despite Wendt's having raised several affirmative defenses, the trial court entered a judgment without making specific findings of fact. We note that where a trial court's judgment in a nonjury case is based on ore tenus testimony, the court's findings of fact are presumed correct, and the judgment will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. McDonald v. Schwartz,706 So.2d 1230 (Ala.Civ.App. 1997). Further, this court has stated that "[w]hen the trial court does not make specific findings of fact, this court will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous. Etno, Inc. v. Rivers,644 So.2d 3 (Ala.Civ.App. 1994)." Simmons v. Woerner Bros.P'ship, 674 So.2d 588, 589 (Ala.Civ.App. 1995).
BSI argues that the trial court erred in entering a judgment in favor of Wendt, because, it says, it presented sufficient evidence to prove its breach-of-contract claim against Wendt and, it claims, Wendt failed to present sufficient evidence to support her affirmative defenses. We agree.
In order to demonstrate that a breach of contract has occurred, a party is
 "required to present evidence in support of the following elements of his claim: (1) the existence of a valid contract between [the parties]; (2) his own performance under that contract; (3) [the other party's] breach, or failure to perform under the contract; and (4) damage sustained as a result of [the other party's] nonperformance. Southern Med. Health Sys., Inc. v. Vaughn, 669 So.2d 98, 99 (Ala. 1995)."
Shelton v. Clements, 834 So.2d 775, 782 (Ala.Civ.App. 2002). *Page 1187 
The record reflects that BSI presented evidence that a valid contract existed between it and Wendt. BSI presented evidence that it performed pursuant to the contract. BSI also presented evidence that Wendt breached the contract and that BSI sustained damage as a result of Wendt's breach.
Before trial, Wendt raised the affirmative defenses of estoppel, failure of consideration, duress, and fraud. See Rule 8(c), Ala. R. Civ. P. "An `affirmative defense' is defined as a `matter asserted by [the] defendant which, assuming the complaint to be true, constitutes a defense to it.' Black's LawDictionary (6th ed. 1990)." City of Birmingham v. BusinessRealty Inv. Co., 722 So.2d 747, 750 (Ala. 1998). "The proponent of an affirmative defense `bears the burden of proving the essential elements of his affirmative defenses.' Ex parte BlueCross Blue Shield of Alabama, 773 So.2d 475, 478 (Ala. 2000)."Ex parte Ramsay, 829 So.2d 146, 152 (Ala. 2002). Although Wendt raised the aforementioned affirmative defenses in her answer, the record indicates that she did not introduce at trial any evidence of the essential elements of estoppel, failure of consideration, or duress.
Collateral estoppel and judicial estoppel apply to issues or positions litigated or maintained in a prior suit. See NorthMontgomery Materials, L.L.C. v. Federal Ins. Co., 843 So.2d 201,204 (Ala.Civ.App. 2002), and Ex parte First Alabama Bank,883 So.2d 1236, 1241 (Ala. 2003). However, judicial estoppel, unlike collateral estoppel, does not require privity between the parties. See Ex parte First Alabama Bank. There is no evidence indicating that the parties were involved in prior litigation involving the same issues or that either party sought to take an inconsistent position from a position it had previously held. Therefore, the trial court could not have based its judgment on either of these forms of estoppel.
Thus, we turn our analysis to the doctrine of equitable estoppel.
 "The purpose of the doctrine of equitable estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience. Mazer v. Jackson Ins. Agency, 340 So.2d 770 (Ala. 1976). The party asserting the doctrine of equitable estoppel may not predicate his claim on his own dereliction of duty or wrongful conduct. Draughon v. General Finance Credit Corp., 362 So.2d 880, 884 (Ala. 1978)."
Pierce v. Hand, Arendall, Bedsole, Greaves Johnston,678 So.2d 765, 768 (Ala. 1996).
In order for the doctrine of equitable estoppel to apply, a party must demonstrate:
 "`(1) That "[t]he person against whom estoppel is asserted, who usually must have knowledge of the facts, communicates something in a misleading way, either by words, conduct, or silence, with the intention that the communication will be acted on";
 "`(2) That "the person seeking to assert estoppel, who lacks knowledge of the facts, relies upon [the] communication"; and
 "`(3) That "the person relying would be harmed materially if the actor is later permitted to assert a claim inconsistent with his earlier conduct.'"
 "Lambert v. Mail Handlers Benefit Plan, 682 So.2d 61, 64 (Ala. 1996), quoting General Electric Credit Corp. v. Strickland Div. of Rebel Lumber Co., 437 So.2d 1240, 1243 (Ala. 1983)." *Page 1188 
Allen v. Bennett, 823 So.2d 679, 685 (Ala. 2001).
The record reflects that the trial court heard disputed testimony as to whether Cindy Valieant, the BSI agent who apparently rented the automobile to Wendt, orally communicated information concerning the "loss damage waiver" provision contained in the rental agreement.[3] Although Wendt alleges that Valieant did not notify her of the loss-damage waiver provision, the record reflects that Wendt had knowledge of the loss-damage waiver provision before signing the agreement. "`A party invoking estoppel must have in good faith been ignorant of the true facts at the time a representation [was] made to him, and must have acted with diligence to learn the truth.'" Lambertv. Mail Handlers Benefit Plan, 682 So.2d 61, 64 (Ala. 1996), quoting Ivey v. Dixon Inv. Co., 283 Ala. 590, 594,219 So.2d 639, 643 (1969).
Valieant testified, without contradiction, that Wendt gave her a form from Wendt's service advisor that stated that Fidelity Warranty, Wendt's warranty company, covered only the cost of the rental of the automobile, not the expense of the loss-damage protection offered under the rental agreement. Further, the rental agreement contained concise, unambiguous statements indicating that loss-damage waiver protection could be purchased by *Page 1189 
Wendt and explaining the limitations of that coverage. The agreement required Wendt to place her initials next to the loss-damage waiver provision if she declined such protection. The record reflects that Wendt did decline such protection. Additionally, Wendt, who is literate, admitted that she did not read the rental agreement before she signed it. Instead, she opted to rely solely on Valieant's instruction to sign the agreement.
The record indicates that the affirmative defenses of failure of consideration and duress were pleaded by Wendt but not proven before the trial court. Failure of consideration is "`the neglect, refusal and failure of one of the contracting parties to do, perform, or furnish, after making and entering into the contract, the consideration in substance and in fact agreed on.'"Lemaster v. Dutton, 694 So.2d 1360, 1366 (Ala.Civ.App. 1996) (quoting 17 C.J.S. Contracts § 129 (1963)). Additionally, "[d]uress is defined as subjecting a person to improper pressure which overcomes his will and coerces him to comply with demands to which he would not yield if acting as a free agent. See, 17 C.J.S. Contracts § 168." Head v. Gadsden Civil Serv. Bd.,389 So.2d 516, 519 (Ala.Civ.App. 1980). Wendt failed to introduce evidence that BSI neglected, refused, or failed to perform or furnish any consideration after entering the rental contract. Similarly, Wendt failed to submit any evidence that indicated that Valieant exerted such pressure as to overcome her will and thereby coerce her into signing the contract. Wendt's assertion that she perceived Valieant to be in a "hurry" falls short of the coercion contemplated in Head.
Wendt's failure to introduce evidence of estoppel, failure of consideration, and duress left only the affirmative defense of fraud to be considered by the trial court.
This court has stated that the elements of a fraud claim are: "`(1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was reasonably relied on by the plaintiff under the circumstances, and (4) that caused damage as a proximate consequence.' Brushwitz v. Ezell, 757 So.2d 423, 429 (Ala. 2000) (citing Foremost Ins. Co. v. Parham, 693 So.2d 409, 422
(Ala. 1997))." Carter v. Liberty Nat'l Life Ins. Co.,849 So.2d 977, 981 (Ala.Civ.App. 2002) (footnote omitted).
Valieant, who had worked for BSI since June 2000, admitted that she did not recognize Wendt as the customer to whom she rented the automobile. However, she stated that she and a male service agent were the only persons employed by BSI at the Friendly Ford dealership on the date the car was rented. She further identified the employee number on the transaction as her number. She stated that she had completed a two to three week training course on how to rent automobiles to customers. She said that she was trained to request that a customer provide proper identification and a major credit card and to inquire regarding the type of vehicle desired, the need for loss-damage protection, and whether additional drivers would be using the vehicle. Although Valieant did not recognize Wendt as the customer to whom she rented the vehicle, she stated that she followed proper procedure when she rented the car to the customer. She said that she typed the information from the customer's driver's license into the computer. She then stated that the computer prompted her to another screen on which she designated whether the rental was a warranty rental. Valieant said that the loss-damage waiver provision is contained on the middle of that screen. She stated that at that point she questions every customer as to whether they want *Page 1190 
the loss-damage protection offered under the rental agreement. She testified that, based on the presence of Wendt's initials next to the loss-damage waiver provision, Wendt denied the loss-damage protection offered under the agreement. Valieant stated that she gave the customer a copy of the rental agreement and the accompanying pamphlet. Valieant stated that, according to the printout of the rental agreement, the rental took place at 4:04 p.m. She said that she would not have been in a "hurry" when she rented the automobile to Wendt because she was scheduled to work until 6:00 p.m. She stated that Wendt handed her a form that was given to Wendt by a service advisor containing Wendt's name and the number of days she would be able to rent the car. Valieant stated that the form that Wendt handed her stated that the warranty company covered the cost of the rental but not the expense of the loss-damage protection. Valieant admitted that she tells every customer to put proof of insurance in the rental vehicle as a precaution in case the customer is stopped for a traffic violation. She stated that she never tells her customers that their insurance may not cover their use of a rental vehicle because she does not know the particular provisions of her customers' insurance policies.
Wendt testified that on January 12, 2001, she received a call from David Wilson at Friendly Ford, who had spoken with a Fidelity Warranty representative concerning the mechanical problem with Wendt's vehicle. Apparently the representative of the warranty company had indicated that he had arranged to have a rental car provided for Wendt because the repairs were taking longer than expected. According to Wendt's testimony, Wilson instructed her to hurry to the dealership because it would be closing shortly. According to Wendt's testimony, Wendt, her daughter, her son-in-law, and her two grandchildren, arrived at Friendly Ford at approximately 4:30 p.m. on January 12, 2001. Upon arrival at BSI's location in the dealership, Wendt stated that she informed the BSI agent that she was there for the car that David Wilson had on "hold" for her. Wendt did not recognize Cindy Valieant as the agent who had rented the car to her. According to Wendt, the agent "carried on a conversation," asking Wendt what make and model car she had and informing her that she would place her in a later model rental car. Wendt recalled that the agent then asked her if she had proof of insurance; she responded that she had proof in the glove compartment of her car. Wendt stated that the agent then instructed her to initial one portion of the rental agreement and to sign another. Wendt said that the agent gave her the keys to the rental vehicle and that she then went to retrieve her insurance papers from her vehicle. She stated that the agent never mentioned the loss damage waiver provision. She testified that she had initialed and signed the agreement because she was instructed to do so by the agent, who appeared to be in a hurry. She stated that she did not have time to review the documents that the agent gave her to sign because the agent was in a big hurry. She said that she believed the dealership was about to close because the garage doors were closed and had to opened so that she could retrieve her insurance papers from her vehicle. She went on to state that she "took it for granted" that the rental vehicle was insured because the agent instructed her to keep her proof of insurance in the rental car.
Summer Adair, Wendt's daughter, testified that she accompanied her mother when she rented the automobile. Adair also did not recognize Valieant as the agent who had rented the automobile to *Page 1191 
her mother. Adair testified that the transaction between her mother and the agent was quick. She stated that when they arrived the agent had all the documentation pertaining to the rental of the automobile printed and laying on her desk. She also stated that there was no computer on the desk. Adair recalled the agent asking her mother to sign the rental agreement in one place and to initial it in another, asking her mother what type of insurance she had, and instructing her mother to place her proof of insurance in the rental car. Adair said that the agent never offered her mother loss-damage protection. Adair testified that she and her mother were escorted to her mother's vehicle so that her mother could retrieve proof of insurance from her vehicle.
Even if we assume that Valieant willfully, recklessly, unknowingly, or mistakenly misrepresented a material fact to Wendt concerning the loss-damage protection available for the rental vehicle, Wendt could not have reasonably relied on such information.
 "In Foremost Insurance Co. v. Parham, 693 So.2d 409
(Ala. 1997), our supreme court overruled Hickox v. Stover, 551 So.2d 259 (Ala. 1989), and replaced the `justifiable-reliance' standard formerly applied in fraud cases with the `reasonable-reliance' standard. The `justifiable-reliance' standard adopted under Hickox `eliminated the general duty on the part of a person to read the documents received in connection with a particular transaction (consumer or commercial).' Parham, 693 So.2d at 421. The return to the `reasonable-reliance' standard once again provided a mechanism
 "`whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.'
"Id. at 421. Our supreme court has also stated:
 "`"[A] person who signs an instrument without reading it, when he can read, can not, in the absence of fraud, deceit or misrepresentation, avoid the effect of his signature, because [he is] not informed of its contents; and the same rule [applies] to one who can not read, if he neglects to have it read, or to enquire as to its contents."'
 "Mitchell Nissan, Inc. v. Foster, 775 So.2d 138, 140 (Ala. 2000), quoting Beck Pauli Lithographing Co. v. Houppert, 104 Ala. 503, 506, 16 So. 522, 522
(1894) (emphasis added in Mitchell Nissan)."
Banks v. SCI Alabama Funeral Servs., Inc., 801 So.2d 20, 24
(Ala.Civ.App. 2001). Further,
 "This Court has held that a person who signs a contract document is on notice of the terms therein and is bound thereby, even if he or she fails to read the document. Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303, 306 (Ala. 1997). It would impose a punitive result upon [the other party to the contract] for this Court to determine that a party who chooses not to read a contract she enters is not obligated by the contract and can ignore any provision that does not suit her. Id."
Safeway Ins. Co. of Alabama v. Taylor, 758 So.2d 523, 525-26
(Ala. 1999).
"`[Under the reasonable-reliance] standard, a person cannot blindly rely on an agent's oral representations to the exclusion of written disclosures in a contract. Ex Parte Caver,742 So.2d 168, 173 (Ala. 1999).'" Liberty Nat'l Life Ins. Co. v. Ester,880 So.2d 1112, 1115 (Ala. 2003) (quoting Harold Allen's MobileHome Factory Outlet v. Early, 776 So.2d 777, 784 (Ala. 2000)). *Page 1192 
It is undisputed that Valieant, regardless of any statements she may have made to the contrary, supplied Wendt with a copy of the rental agreement that Wendt entered into on January 12, 2001. Wendt's contention that she felt "hurried," coupled with her admission that she was literate but simply failed to read the contract, does not meet the reasonable-reliance standard. Moreover, in Ex parte Perry, 744 So.2d 859 (Ala. 1999) (Hooper, C.J., with two Justices concurring and two Justices concurring in the result), the main opinion noted that a party is responsible for reading a contract to which he has committed himself upon signing, irrespective of whether the party felt "hurried." 744 So.2d at 863. The signing party is ultimately responsible for his acquiescence to a written agreement and, therefore, is in control of the contractual process. If he feels "hurried," in order to guard against any potential liability, it is his duty to slow or stop the process until he has sufficient time to thoroughly read the agreement.
To permit Wendt to avoid liability because she failed to read the rental agreement would impose the punitive result on BSI that our supreme court sought to avert in Safeway Insurance Co., supra.
Accordingly, we reverse the trial court's judgment and remand the case for the trial court to enter an order consistent with this opinion.
OPINION OF JANUARY 16, 2004, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING OVERRULED; REVERSED AND REMANDED.
CRAWLEY, THOMPSON, PITTMAN, and MURDOCK, JJ., concur.
[1] At trial, the parties stipulated that the vehicle sustained $14,695.51 in damage.
[2] Safeway Insurance Company of Alabama("Safeway") was added as a third-party defendant on November 27, 2001. On July 30, 2002, the trial court entered a judgment declaring that Wendt's automobile insurance policy with Safeway did not cover the damage to the automobile she had rented from BSI.
[3] The record reflects that the rental agreement consisted of a one-page printout, which required Wendt to initial in one place and to sign in another, and an accompanying pamphlet that explained the provisions of the agreement in detail. The rental agreement contained two separate and distinct areas that required, in one place, Wendt's initials and, in another place, Wendt's signature. The portion of the rental agreement that required Wendt's initials reads:
"I decline Loss Damage Waiver(LDW).
 "Liability protection provided in this rental agreement is secondary to any other applicable insurance. I agree to and acknowledge the provisions above. [Wendt initialed here]."
The portion of the agreement that required Wendt's signature reads:
 "I HAVE RECEIVED AND AGREE TO: ALL TERMS AND CONDITIONS OF THE RENTAL AGREEMENT INCLUDING THE SEPARATE FOLDER DELIVERED TO ME WITH THIS RENTAL DOCUMENT; ONLY I AND AUTHORIZED DRIVER(S) MAY DRIVE THE VEHICLE; PENALTY AND RATE CHANGE IF THE VEHICLE IS NOT RETURNED TO THE LOCATION AT DATE AND TIME DESIGNATED FOR RETURN ABOVE. [Wendt's signature appears here]."
(Capitalization in original.)
The "Terms and Conditions of Rental Agreement" section of the accompanying pamphlet contained a subsection entitled "Loss Damage Waiver Option (LDW)/Responsibility for Loss of or Damage to the Vehicle," which reads:
 "If I am involved in an accident or the car sustains damage, even from unknown causes, or the Vehicle suffers loss or is stolen, I am responsible for the resulting loss or damages, as permitted by law. This includes estimated cost of repairs, towing, storage, impound fees, loss of use, claims processing fees, and administrative charges, regardless of fault. This financial responsibility is eliminated or reduced as indicated on the Rental document if I accept the LDW option, pay for it, and comply with this Agreement, including all terms and Conditions.
 "I UNDERSTAND THAT LDW IS NOT INSURANCE. I understand that my personal automobile insurance policy may cover loss and damages to the rental vehicle as well as fire, theft, and personal injury incurred while using a rental vehicle; that [BSI] cannot interpret the terms of my insurance policy; and that it is my responsibility to check with my insurance company and my insurance agent. I further understand that [BSI] cannot interpret the terms of my credit cards and it is my responsibility to learn if my credit cards cover loss or damage to the vehicle.
 "If I accept the LDW option, I agree to pay the charge per day shown on the Rental document for each full or partial day. The annualized rate for the LDW is the daily charge times 365 days."