Rel: June 5, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

———————————————

## CL-2025-0515

———————————————

## Austin Brook and Austin Park Property Owners Association, Inc.

### v.

## William E. Nabors and Sandra R. Nabors

### Appeal from Baldwin Circuit Court
### (CV-23-901009)

PER CURIAM.

Austin Brook and Austin Park Property Owners Association, Inc.

("the POA"), a nonprofit corporation and the governing body of a

residential subdivision in Daphne, appeals from a judgment entered by

the Baldwin Circuit Court regarding the enforcement of certain restrictive covenants.

Procedural History

Sandra R. Nabors purchased property from Annalea Rolle in the Austin Park II subdivision ("the subdivision") in 2013. The deed provided that the conveyance was subject to "[r]estrictive covenants as contained in instruments recorded in Instrument No. 916523, Instrument No. 1010144, Instrument No. 1055892 and Instrument No. 1174469." The deed from Rolle stated that "IN WITNESS WHEREOF, Grantor has hereunto set her hand and seals on September 5, 2013." (Capitalization in original.) On August 18, 2018, Sandra transferred her interest in the property, pursuant to a quitclaim deed, to herself and her husband, William E. Nabors.

On August 14, 2023, the POA sued the Naborses, alleging that they had failed to comply with the covenants applicable to the property by regrading their lot and by installing a concrete patio, an aboveground pool, and a fence without the approval of the subdivision's architectural-review committee. On September 22, 2023, the Naborses filed an answer, denied that the POA had stated a valid claim, and asserted certain

2

affirmative defenses, including waiver, estoppel, harassment, the running of the applicable statute of limitations, and discriminatory enforcement. Following a bench trial, the trial court entered a final judgment stating:

"This matter came before the Court on April 7, 2025. Judgment is entered on behalf of the Plaintiff, [the POA,] and against the Defendants, [the Naborses], as follows:

"1. The [Naborses] shall remove or lower the deck and/or railing surrounding their swimming pool such that it is concealed by [their] privacy fence while looking from street level.

"2. [The Naborses] are ordered to maintain the preventive measure they have taken to address the erosion issues.

"3. A judgment is entered in favor of [the POA] and against the [Naborses] in the amount of $6,053.02 for the recovery of which let execution issue.

"4. All other relief requested is hereby denied.

"5. Costs were prepaid."

On May 14, 2025, the POA filed a motion to alter, amend, or vacate the judgment. That same day, the POA filed a motion for an award of attorneys' fees and expenses in the amount of $15,738. On June 3, 2025, the trial court denied the postjudgment motion but granted the POA's motion for an award of attorneys' fees. On June 4, 2025, the trial court

entered an amended judgment to include the amount of $15,738 in attorneys' fees. On July 2, 2025, the POA filed its notice of appeal.

The Bench Trial

At the trial, the following pertinent evidence was adduced. Brandy Robertson-Phillips, the president of the POA, testified that her husband had purchased property in the subdivision in 2012. Robertson-Phillips stated that she and her children had moved onto the property with her husband. She said that their property was behind the Naborses' property. Robertson-Phillips stated that any proposed changes to property in the subdivision had to be submitted to the architectural-review committee and approved by the committee before those changes could be made. Robertson-Phillips testified that there were restrictions on grading applicable to the properties in the subdivision. She stated that fences had to be approved by the architectural-review committee.

Robertson-Phillips testified that pools had to be "in ground in nature." She stated that an inground pool is a pool that is level with the ground. She stated that the architectural-review committee required that a plan for a pool contain survey information, property lines, and offset lines. She acknowledged that aboveground spas or hot tubs could

be permitted if approved by the architectural-review committee. Robertson-Phillips testified that the Naborses have an aboveground pool, that they have decking that goes around the pool, that they have hand railing that goes around the pool, and that grading changes were made to the Naborses' property. She stated that she could not find any written record of the architectural-review committee approving any of those changes to the property. Robertson-Phillips explained that she had spoken with "multiple years of committee members" and none of them had any written records approving the changes.

Robertson-Phillips testified that the Naborses had made grading changes and put up a new privacy fence in May 2023. She stated that the Naborses had not obtained approval from the architectural-review committee for the 2023 changes. Robertson-Phillips said that the Naborses also had added larger rocks and concrete in the patio area. She stated that the Naborses' fence had caused erosion on her property. Robertson-Phillips testified that the POA's position was that the Naborses' pool was an aboveground pool. She stated that the hand railing around the pool extends above the existing privacy fence. She stated that the POA was asking for attorneys' fees. Robertson-Phillips

5

testified that the Naborses' adult son, who was mentally disabled, liked to stand on the pool deck and wave to people and blow bubbles.

Robertson-Phillips stated that she had been president of the POA since April 2024. She stated that she and her husband, Jeff Phillips, had previously been members of the POA board in 2012 or 2013. She said that her husband was no longer a member of the board. Robertson-Phillips stated that the Naborses had replaced the pool on their property. Robertson-Phillips said that she had contacted the POA board when the Naborses built their pool. She said that neither she nor her husband were members of the board in 2017 when the pool was built. Robertson-Phillips testified that she was unaware of any conversations between the Naborses and any board member regarding the pool.

Robertson-Phillips testified that the POA issued a letter in 2022 asking the Naborses to cease building the decking around the pool. She stated that she did not have a similar cease-and-desist letter regarding the construction of the swimming pool. Robertson-Phillips testified regarding the elevation of the Naborses' property. She stated that she believed the hand railing around the pool was a violation of the restrictive covenants because it had not been approved by the architectural-review

6

committee. She said that part of the objection regarding the hand railing was that it was visible over the privacy fence. Robertson-Phillips said that anything showing above a fence amounted to a violation of the covenants unless permission had been obtained from the subdivision's architectural-review committee. She stated that the most recent construction in the Naborses' backyard began in May 2023 or the middle of June 2023. When asked whether there was a provision in the covenants allowing plans to proceed if no response was received after submission to the architectural-review committee, Robertson-Phillips responded that she did not know. Counsel for the POA stipulated that paragraph 3.C. of the restrictive covenants authorizes a resident to proceed with construction if the architectural-review committee does not respond to the submitted plans within 30 days.

Robert Dixon testified that he had purchased property in the subdivision in 2018. Dixon became a member of the POA board in 2021. He said that he was unaware of any record approving the pool, the decking, or the concrete-rock additions to the Naborses' property. Dixon testified that, when he became aware that the Naborses were building a fence that was too high, he had had a conversation with William Nabors.

Dixon stated that William had been angry about being questioned regarding the fence.

Dixon said that William had come to a meeting of the POA board to discuss the pool. Dixon stated that William had told the board about incidents at the subdivision's community pool involving parents of younger children because of the Naborses' adult son wanting to play with those children.

Roy Forson testified that he had lived in the subdivision from 2012 to 2023. Forson stated that he had been a member of the POA board from 2020 through November 2023. Forson testified that he had been at the Naborses' house and that he had given William permission to install a handrail around the pool. Forson acknowledged that the Naborses' pool and deck already existed at that time. During questioning by the POA's counsel, Forson explained:

> "[Forson]: I told him that he could put up the handrail; but if it was high enough to where it could be seen over the fence and if people were on the deck and they could be seen over -- if he changed the deck -- elevation of the deck, then he wouldn't be allowed to do that. But I did tell him he could put up the handrail.
>
> "[The POA's counsel]: But you never approved verbally or in writing or otherwise anything else?

"[Forson]: Nothing else."

Forson stated that the architectural-review committee never voted on anything concerning the Naborses' property. Forson said that William had told him that he had not gotten approval to put in the pool. Forson testified that he was friends with the Naborses and that he and his wife would sometimes swim in the pool. Forson said that part of the pool was in the ground and part of the pool was above the ground. He stated that the deck around the pool appeared to be appropriately constructed.

Jeff Phillips testified that he and his wife lived near the Naborses. Phillips stated that the Naborses had changed the elevation on their property, which, he said, had caused water to run onto the Phillipses' land. Phillips testified that they did not mind the pool at first because the Naborses' disabled son would swim in it. He stated that he did mind the later additions of the deck and fence. Phillips testified that he had been a member of the POA board but could not recall the dates. Phillips stated that the pool had been in place for eight years. Phillips denied that he told William that he could do whatever he wanted in his backyard as long as it was behind the privacy fence.

William testified that his family moved to their property in 2013. William stated that his "special-needs" adult son lived with them. William testified that he had built a part inground and part aboveground pool for the family. William said that he sought approval from the architectural-review committee. William explained that he went to one of the meetings of the committee with his son. William testified:

> "I went to one of their meetings, and I brought [my son] with me. And I explained why -- we why we were doing -- why we put it in. Because he wasn't welcome at the pool itself from other parents because he liked to run up on them. I explained -- I brought him with me and let them all meet him.

> "I said, you guys know him. They all said, yeah, we know [him], we see him out there all the time. I said, we put it in because he needs a safe place where he can enjoy the water without having to bother other people. And so -- and also that -- that this was necessary for his development. I was told that if we do not get back with you within 30 days, it's fine. No one contacted me."

William testified that he later learned that there was a problem with the pool because it was partially inground and partially aboveground. He said that he was never served with a cease-and-desist letter regarding the pool. He stated that the pool was built in 2017. William testified that, before the pool was built, Phillips had told him that the pool was fine as long as it was behind the privacy fence. William

said that he believed Phillips had the authority of the POA. He said that Forson and his wife had been swimming in the pool. William explained that Forson, as president of the POA, had recommended that William install a handrail around the deck of the pool. William stated that he received a cease-and-desist letter regarding the deck in March 2022. William said that the deck had already been installed at that time.

William testified that he submitted a form to the architectural-review committee to replace his privacy fence but never received anything from the committee. William admitted that he had to trim some poles on the privacy fence to meet the six-feet height requirement of the covenants. William admitted that the handrails on the deck could be seen over the privacy fence. William stated he had placed a barrier underneath the rocks that had been added to the backyard to prevent erosion. Although William was asked whether removing the additions to the property would be a financial hardship, counsel for the POA objected to that question, and the trial court sustained the objection.

## Standard of Review

"'The ore tenus standard of review generally applies to judgments entered following a bench trial.' R & G, LLC v. RCH IV-WB, LLC, 122 So. 3d 1253, 1256 (Ala. 2013).

"'Under the ore tenus standard of review, findings on disputed facts are presumed correct, and the trial court's judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust. Southside Cmty. Dev. Corp. v. White, 10 So. 3d 990, 991 (Ala. 2008). "'"The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.'"'" 10 So. 3d at 991-92 (quoting Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So. 2d 924, 929 (Ala. 2007), quoting in turn Waltman v. Rowell, 913 So. 2d 1083, 1086 (Ala. 2005), quoting in turn Dennis v. Dobbs, 474 So. 2d 77, 79 (Ala. 1985)).'

"Lawson v. Harris Culinary Enters., LLC, 83 So. 3d 483, 491 (Ala. 2011).

"Under the ore tenus standard, 'when a trial court makes no specific findings of fact, "[an appellate court] will assume that the trial judge made those findings necessary to support the judgment."' New Props., L.L.C. v. Stewart, 905 So. 2d 797, 799 (Ala. 2004) (quoting Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So. 2d 375, 378 (Ala. 1992)). 'Additionally, we note that "the ore tenus standard is inapplicable 'where the evidence is undisputed, or where the material facts are established by the undisputed evidence.' Salter v. Hamiter, 887 So. 2d 230, 234 (Ala. 2004)." Burkes Mechanical[, Inc. v. Ft. James-Pennington, Inc.], 908 So. 2d [905,] 910 [(Ala. 2004)]. In such cases, appellate review is de novo. Id.' Lawson, 83 So. 3d at 491."

Merchants Bank v. Head, 161 So. 3d 1151, 1153-54 (Ala. 2014).

Discussion

12

In its brief, the POA insists that the pool, the concrete patio, and the raised deck with the hand railing must be removed from the property because, it contends, those additions violate the covenants applicable to the property.[1] The POA argues that the Naborses failed to obtain written approval from the subdivision's architectural-review committee in violation of the unambiguous covenants, that the covenants provide that failure to enforce a covenant does not waive the right to enforce the covenant thereafter, and that the Naborses did not plead or present evidence of relative hardship relating to the enforcement of the covenants.

At the outset, we note that we agree with the POA's argument that the Naborses did not plead or present evidence of relative hardship. "The relative-hardship test is 'an equitable doctrine that generally provides that a restrictive covenant "will not be enforced if to do so would harm one landowner without substantially benefitting another landowner."'"

---

[1] At the trial, there was testimony regarding the privacy fence installed in 2023 and erosion issues. The POA does not challenge on appeal the trial court's judgment regarding the fence and erosion issues; therefore, those arguments are waived. See Gary v. Crouch, 923 So. 2d 1130, 1136 (Ala. Civ. App. 2005) ("[T]his court is confined in its review to addressing the arguments raised by the parties in their briefs on appeal; arguments not raised by the parties are waived.").

Bekken v. Greystone Residential Ass'n, Inc., 227 So. 3d 1201, 1216 (Ala.

Civ. App. 2017) (quoting Grove Hill Homeowners' Ass'n v. Rice, 90 So. 3d

731, 736 (Ala. Civ. App. 2011) (abrogated on other grounds), quoting in

turn Lange v. Scofield, 567 So. 2d 1299, 1302 (Ala. 1990)).

Our supreme court in Cole v. Davis, 383 So. 3d 646, 653-54 (Ala.

2023), summarized the relative-hardship test as follows:

> "Although, as noted earlier, the breach of a restrictive covenant is, by itself, enough to warrant the issuance of an injunction, in Lange [v. Scofield, 567 So. 2d 1299 (Ala. 1990),] this Court stated that enforcement of covenants running with land '"is governed by equitable principles, and will not be decreed if, under the facts of the particular case, it would be inequitable and unjust."' 567 So. 2d at 1302 (quoting 20 Am. Jur. 2d Covenants, Conditions & Restrictions § 313 (1965)).
>
> "....
>
> "If '"the restrictive covenant has ceased to have any beneficial or substantial value"' or '"the defendant will be subject to great hardship or the consequences would be inequitable,"' a court, applying equitable principles, ... will not enforce the covenant. Id. (citation omitted).
>
> "In Lange, this Court explained:
>
>> "'"The equitable enforcement of a restriction can be invoked only for the purpose of protecting the benefit which it was the object of the covenant to afford. If the restrictive covenant has ceased to have any beneficial or substantial value to the ... property, it can form no ground for equitable relief .... [I]f the defendant will be subject to great

14

hardship or the consequences would be inequitable, relief will be denied."'

"Id. (citation omitted)."

Here, the Naborses did not raise relative hardship in their pleadings, and the trial court did not permit William to testify regarding the hardship the removal of the pool, the patio, and the deck with a handrail would cause them. The Naborses have not sought appellate review of the trial court's rulings barring the introduction of evidence regarding the potential applicability of the relative-hardship principles summarized in Cole, supra. Accordingly, the defense of relative hardship is not available to support the trial court's judgment.

We now turn to the covenants, which provide in pertinent part:

"3. Architectural Review Committee: In order to maintain such property as a pleasant and desirable environment, to establish and preserve a harmonious design for the community, and to protect and promote the value of the property, no home, building, gazebo, fence, garage, or any other structure or improvement of any nature or addition shall be erected, placed, attached to or altered until the proposed plans, specifications, exterior color and finish, plot plan (showing proposed location of such home, building or structure, drive and parking area), building height and grading, and drainage plans shall have been approved in writing by the Architectural Review Committee prior to commencement of construction.

15

"A. The architectural and design review shall be directed toward obtaining the following objectives:

"1. Preventing excessive or unsightly grading, indiscriminate earth moving or clearing of property, removal of trees and vegetation which could cause disruptions of natural water courses or seat natural land forms;

"2. Insuring [sic] that the architectural design of structures and their materials and colors are visually harmonious with the overall appearance of the community; and

"3. Insuring [sic] that any development, structure or landscaping complies with the provisions of these covenants.

"B. The committee shall be composed of three (3) individuals designated by the Developer during the period of developer control; and by a majority of the Property Owners Association members after the period of developer control. The affirmative vote of a majority of the members of the Committee shall be required in order to issue any permit. The Developer shall retain control of the Architectural Review Committee until the Developer has sold and conveyed all the lots subject to this declaration. Developer has the right to relinquish control to the property owners association at any time it chooses for the purpose of the property Owners to control the Committee.

"C. One (1) copy of all plans <u>and</u> related data shall be submitted to the Architectural Review Committee. Approvals shall be dated and shall not be effective for construction commenced more than twelve (12) months after such approval. Disapproved plans and related data shall be accompanied by a reasonable statement of the items found unacceptable. In the event approval of such plans is neither granted nor denied within thirty (30) days following receipt by the Architectural Review Committee of the written request for approval, the provisions of these sections under paragraph 3 shall be thereby waived. Refusal or approvals of plans, site location, building height, or specifications may be based by the Architectural Review Committee upon any ground which is consistent with the objectives of these covenants, including purely aesthetic considerations, so long as such ground is not arbitrary or capricious.

"....

"22. <u>Fences</u>: No fencing in excess of six (6) feet in height shall be allowed on any lot and all fences must be constructed of wood or wrought iron. All fencing must face outward from the lot. The Architectural Review Committee, prior to construction thereof, must approve all fences, hedges or ornamental structure.

"23. <u>Pools and Pool Enclosures</u>: All pools and pool enclosures must be designed to compliment [sic] the architectural components of the dwelling. Pools must be of an in ground nature. Pool enclosures may not be free standing. If screening is desired, the enclosure must be designed as an integral part of the roof and walls and not appear as an added appendage. All pool equipment, pumps, and etc. shall be stored out of view and pump houses must be architecturally

17

related. Above ground spas or hot tubs may be permitted with prior written approval of the Architectural Review Committee, and only in rear yards behind walled or screened fence areas.

"....

"37. <u>Miscellaneous</u>

"....

"G. The Developer specifically reserves the right to amend this declaration on its own motion from time to time for a period of fifteen (15) years from the date hereof, so long as such amendment(s) does not materially affect lot or lots subject hereto which is no longer owned by the Developer. The Developer shall have the sole and exclusive right and option to cause more or less contiguous property to be added to or to be made subject to the restrictive covenants herein contained at a later date. Such additions shall not be subject to any restrictive covenants which restrict the use of such added property to a standard less than the standards herein created except that such use may include single family use compatible with the standards set forth herein. This declaration shall be enforceable by the Developer, Architectural Review Committee, or any owner by a proceeding at law or in equity against any person or persons violating or attempting to violate or circumvent any covenant or restriction, either to restrain violation or to recover damages; a failure by any party to enforce any covenant or restriction herein contained for any period of time shall in no event be deemed a

18

waiver or estoppel of the right of any of the foregoing to enforce the same thereafter. "[2]

In <u>Cole</u>, 383 So. 3d at 653, our supreme court explained:

"Our Court has previously recognized that, as a general matter, 'restrictive covenants are not favored in the law and will therefore be strictly construed by this Court.' <u>Lange v. Scofield</u>, 567 So. 2d 1299, 1301 (Ala. 1990). 'All doubts must be resolved against the restriction and in favor of free and unrestricted use of the property.' <u>Id.</u>

"However, when the language of a restrictive covenant is not 'of doubtful meaning [or] ambiguous,' the language of that covenant 'is entitled to be given the effect of its plain and manifest meaning.' <u>Laney v. Early</u>, 292 Ala. 227, 231-32, 292 So. 2d 103, 107 (1974). 'If "there is no inconsistency or ambiguity within a restrictive covenant, the clear and plain language of the covenant is enforceable by injunctive relief."' <u>Hipsh v. Graham Creek Estates Owners Ass'n</u>, 927 So. 2d 846, 848 (Ala. Civ. App. 2005) (quoting <u>Carpenter v. Davis</u>, 688 So. 2d 256, 258 (Ala. 1997)). That proposition of law takes precedence over the disfavor that our Court has previously shown toward restrictions of the use of land. <u>Laney</u>, 292 Ala. at 231, 292 So. 2d at 106-07.

"In <u>Tubbs v. Brandon</u>, 374 So. 2d 1358, 1361 (Ala. 1979), this Court stated:

"'When a restrictive covenant is broken, ... an injunction should be issued because the mere breach of the covenant is a sufficient basis for interference by injunction. The right to enjoin such a breach will not depend upon whether the

---

[2]The covenants were originally recorded in the probate office in 2007.

> covenantee will be damaged by the breach. <u>Reetz v. Ellis</u>, 279 Ala. 453, 186 So. 2d 915 (1966).'"

(Emphasis omitted.)

The POA argues that the Naborses were obligated to obtain written authorization from the architectural-review committee for each of the improvements at issue. It argues that there is no difference among any of the improvements because, it says, each of the improvements required written approval from the architectural-review committee and that the trial court erred in choosing to enforce the covenants regarding some of the improvements and not others. The POA further argues that the language in the covenants binding the Naborses' property is contractual in nature and not ambiguous because, it says, the covenants plainly require written approval from the architectural-review committee before construction of any of the property improvements in this case, including the prohibited aboveground pool. According to the POA, the record reflects that the Naborses violated those covenants regarding the pool (constructed in 2017), the large concrete patio (constructed in 2022), and the raised deck with a handrail (constructed in 2023). The evidence concerning the three additions varies, and we address each in turn.

The pool was partially in the ground according to William and Forson. The covenants provide that "[p]ools must be of an in ground nature." Robertson-Phillips testified that that language means that the pool must be level with the ground. However, there is no written definition in the covenants to that effect. In their responses to interrogatories, the Naborses pointed out that the pool was "of an in ground nature" because it was three feet in the ground at some points.

"Restrictive covenants will be recognized and enforced when established by contract, but they are not favored and will be strictly construed. Carpenter v. Davis, 688 So. 2d 256, 258 (Ala. 1997)." Hipsh v. Graham Creek Ests. Owners Ass'n, Inc., 927 So. 2d 846, 848 (Ala. Civ. App. 2005). When the language in a restrictive covenant is ambiguous, its construction will not be extended by implication or include anything prohibited and all doubts and ambiguities must be resolved against the party seeking enforcement. Vestlake Cmtys. Prop. Owners' Ass'n, Inc. v. Moon, 86 So. 3d 359, 365 (Ala. Civ. App. 2011). In written instruments, two types of ambiguities can arise: a patent ambiguity and a latent ambiguity. McCollum v. Atkins, 912 So. 2d 1146, 1148 (Ala. Civ. App. 2005). A patent ambiguity results when a document, on its face,

21

contains unclear or unintelligible language or language that suggests multiple meanings. Vestlake, 86 So. 3d at 365. "'A patent ambiguity is not a true ambiguity; it is merely confusion created on the face of the [instrument] by the use of defective, obscure or insensible language.'" McCollum, 912 So. 2d at 1148 (quoting Jacoway v. Brittain, 360 So. 2d 306, 308 (Ala. 1978)). A latent ambiguity occurs when the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings. Bekken, 227 So. 3d 1201.

Here, the trial court did not order that the pool be removed. There was testimony from William and Forson that the pool was partially inground. The covenants provide that "[p]ools must be of an in ground nature," an ambiguous phrase. Robertson-Phillips testified that this means the pool must be entirely flush with the ground, but there is no written definition in the covenants to that effect. In their responses to the interrogatories, the Naborses pointed out that the pool was "of an in ground nature" because it was three feet in the ground at some points.

Regarding permission from the architectural-review committee to

build the pool, William testified that, before the pool was built, he had discussed the pool with Phillips and that Phillips had told him that the pool was fine so long as the pool was behind the privacy fence. Phillips testified that he did not mind the pool, but he denied that he had told William that he could build whatever he wanted in his backyard so long as it was covered by the privacy fence. Forson, who was on the POA board after the pool was built, testified that he sometimes swam in the pool. William testified that he orally informed the architectural-review committee of the plan to build the pool and that he was informed that, unless the committee contacted him within 30 days stating otherwise, he could proceed with the pool. Counsel for the POA stipulated that the covenants authorize a resident to proceed with construction if the architectural-review committee does not respond to submitted plans within 30 days. Paragraph 3.C. of the covenants provides, in pertinent part: "In the event approval of such plans is neither granted nor denied within thirty (30) days following receipt by the Architectural Review Committee of the written request for approval, the provisions of these sections and paragraph 3 shall be waived." Robertson-Phillips testified that she had informed the POA and the architectural-review committee

23

that the Naborses were building the pool and that no action was taken to prevent the construction of the pool. No evidence was presented that the committee sent the Naborses a cease-and-desist letter despite being aware of the construction of the pool in 2017.

William met with the architectural-review committee seeking approval for the pool in 2017, substantially performing under the covenants, and no action was taken by the committee to prevent the construction of the pool.

> "'Substantial performance of a contract does not contemplate exact performance of every detail but performance of all important parts.' [Mac Pon Co. v. Vinsant Painting & Decorating Co., 423 So. 2d 216, 218 (Ala. 1982)]. 'Whether a party has substantially performed a promise under a contract is a question of fact to be determined from the circumstances of each case.' Cobbs v. Fred Burgos Constr. Co., 477 So. 2d 335, 338 (Ala. 1985)."

Superior Wall & Paver, LLC v. Gacek, 73 So. 3d 714, 721 (Ala. Civ. App. 2011). Substantial performance relating to a covenant requirement has been found sufficient in other jurisdictions. See City of Gulfport v. Wilson, 603 So. 2d 295, 299 (Miss. 1992) (holding that, although an amendment to a restrictive covenant required a vote of subdivision members, circulating a petition among members constituted substantial compliance with the procedure); O'Neill-Marnecheck v. Val's Prop. Dev.

24

LLC, [Ms. 2023-CA-01110-COA, Mar. 24, 2026] ___ So. 3d ___ (Miss. Ct. App. 2026) (holding that homeowners cured their breach of beginning construction without submission to and approval by the architectural committee when they submitted plans that substantially complied with the covenants); Lyerly v. Malpass, 82 N.C. App. 224, 346 S.E.2d 254 (1986) (applying substantial-performance doctrine to covenants in recorded subdivision plat and oral representations binding subdivision developer to provide six-foot-deep channel).

Additionally, the trial court could have determined that the POA was equitably estopped[3] from having the pool removed, as was asserted by the Naborses as an affirmative defense to the POA's complaint. In Hankins v. Crane, 979 So. 2d 801 (Ala. 2007), the plaintiffs had alleged that the defendants' driveway that connected their house to a public road wrongfully crossed a lot owned by the plaintiffs, who were the developers

---

[3]We recognize that the covenants provide that a failure by any party to enforce a covenant shall not be deemed a "waiver or estoppel of the right of any of the foregoing to enforce the same thereafter." Here, the architectural-review committee, a party under the covenants, was silent following its meeting with William regarding permission to construct the pool. That silence was acted upon by the Naborses. The language used in the covenant, i.e., the failure to enforce, is inapplicable here because the nonaction following the request to build is deemed an approval by the architectural-review committee after 30 days.

of the subdivision. They also alleged that the defendants had placed two mobile homes on another lot in the subdivision in violation of a subdivision restriction. The trial court entered a summary judgment in favor of the plaintiffs. On appeal, this court addressed, among other things, whether the plaintiffs' claims were barred by the doctrine of equitable estoppel. This court stated:

> "'In order for the doctrine of equitable estoppel to apply, a party must demonstrate:
>
>> "'"'(1) That "[t]he person against whom estoppel is asserted, who usually must have knowledge of the facts, communicates something in a misleading way, either by words, conduct, or silence, with the intention that the communication will be acted on;"
>>
>> "'"'(2) That "the person seeking to assert estoppel, who lacks knowledge of the facts, relies upon [the] communication;" and
>>
>> "'"'(3) That "the person relying would be harmed materially if the actor is later permitted to

26

assert a claim inconsistent with his earlier conduct."'

""'_Lambert v. Mail Handlers Benefit Plan_, 682 So. 2d 61, 64 (Ala. 1996), quoting _General Electric Credit Corp. v. Strickland Div. of Rebel Lumber Co._, 437 So. 2d 1240, 1243 (Ala.1983)."

"'_Allen v. Bennett_, 823 So. 2d 679, 685 (Ala. 2001).'

"'_BSI Rentals, Inc. v. Wendt_, 893 So. 2d 1184, 1187-88 (Ala. Civ. App. 2004).

"'Estoppel ... requires activity both by the plaintiff and by the defendant. The plaintiff must have acted so as to evidence an intent not to enforce his rights under the restrictive covenant and the defendant must have acted in reliance upon plaintiff's conduct so as to make it inequitable for the plaintiff to assert his rights.'

"_Tubbs v. Brandon_, 374 So. 2d 1358, 1361 (Ala. 1979)."

_Hankins_, 979 So. 2d at 810-11. Here, William and his son attended a meeting of the architectural-review committee and asked for permission to build the pool. There was no follow up from the committee before 30 days had elapsed. The POA was aware of the construction of the pool in 2017 based on Robertson-Phillips's testimony. No cease-and-desist letter was sent to the Naborses regarding the pool. Lastly, there was evidence

27

of material harm to the Naborses' son's development and safety in seeking to now remove the pool.

In contrast to the aspect of the judgment concerning the construction of the pool, the trial court's judgment regarding the construction of the concrete patio and the deck with a handrail is not supported by the evidence. Robertson-Phillips testified that William had not requested approval to build the patio. William testified that no one told him that he needed approval from the architectural-review committee to build the deck. On March 3, 2022, a cease-and-desist letter was sent to the Naborses regarding the patio. William testified that the patio had been completed at that time. William submitted a request on March 12, 2022, through an email, seeking approval of the patio after it had already been built. William testified that Forson, a former member of the POA board, had approved the deck; however, Forson was not a member of the architectural-review committee. Forson did recommend that William install a handrail on the deck, and Forson testified that he had told William that he could build the handrail so long as it did not exceed the height of the fence. However, Forson clarified that he never "approved" anything else.

The Naborses did not seek permission from the architectural-review committee, in writing or otherwise, before constructing either the patio or the deck with a handrail.  Cease-and-desist letters were sent to the Naborses regarding those construction projects. Paragraph 3 of the covenants provides that the purpose of requiring prior written approval from the architectural-review committee before certain improvements or alterations is to "maintain such property as a pleasant and desirable environment, to establish and preserve a harmonious design of the community, and to protect and promote the value of the property."  The pertinent covenants in this case clearly express that actions involving improvements affecting the appearance of the properties in the subdivision require prior written approval by the committee.   The covenants provide that before construction of any "home, building, gazebo, fence, garage, or any other structure or improvement of any nature or addition" that is "erected, placed, attached to or altered" is undertaken, "the proposed plans, specifications, exterior color and finish, plot plan (showing proposed location of such home, building or structure, drive and parking area), building height and grading, and drainage plans" must be approved in writing by the architectural-review

committee. The Naborses failed to comply in any way with the covenants. See Bramlett v. Dauphin Island Prop. Owners Ass'n, 565 So. 2d 216 (Ala. 1990) (requiring building-permit holder to obtain approval of amendment to construction plans before building boat lift, which had not been part of the originally approved construction plans); Esfahani v. Steelwood Prop. Owners' Ass'n, Inc., 271 So. 3d 839 (Ala. Civ. App. 2018) (holding that homeowner's installation of palm trees breached subdivision's restrictive covenants when the covenants required approval to make any landscaping alterations).

Conclusion

The judgment of the trial court is affirmed as to the POA's claim that the pool should be removed. Because the patio and the deck violate the covenants governing the subdivision, the judgment of the trial court regarding those additions is reversed. The cause is remanded for proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

Edwards, Hanson, Fridy, and Bowden, JJ., concur.

Moore, P.J., concurs in the result, without opinion.